**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**

ALL CELL TECHNOLOGIES, LLC and ILLINOIS INSTITUTE OF TECHNOLOGY,

Plaintiff,

v.

WORKHORSE MOTOR WORKS INC. and WORKHORSE GROUP INC.

Civil Action No. 1:19-cv-2975

**JURY TRIAL DEMANDED**

**DEFENDANTS WORKHORSE MOTOR WORKS INC.'S AND WORKHORSE GROUP INC.'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**

Defendants, Workhorse Motor Works Inc. and Workhorse Group Inc. (collectively "Workhorse") by their undersigned counsel, hereby submit this Answer, Affirmative Defenses, and Counterclaims to the Complaint filed by All Cell Technologies, LLC ("All Cell") and Illinois Institute of Technology ("IIT") (collectively "Plaintiffs"), and state as follows:

## GENERAL DENIALS

Pursuant to Fed. R. Civ. P. 8(b)(3), Workhorse denies all allegations in Plaintiffs' Complaint except those specifically admitted below. Any factual allegation below is admitted only as to the specific admitted facts, not as to any purported conclusions, characterizations, implications, or speculations that arguably follow from the admitted facts. Workhorse denies that Plaintiffs are entitled to the relief requested or any other relief. Workhorse responds to the Complaint as follows:

## NATURE OF THE CASE

1. This is an action arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq*.

**ANSWER:** Workhorse admits this action purports to arise under the patent laws of the United States, 35 U.S.C. § 1 *et seq*. Workhorse denies each and every remaining allegation of Paragraph 1.

## THE PARTIES

2. All Cell is a limited liability company organized under the laws of the State of Illinois with a place of business at 2321 West 41st Street, Chicago, Illinois 60609. All Cell was incorporated in 2001, and lists Illinois Institute of Technology professors S. Al-Hallaj and J. Selman as the two managers of the company. All Cell is in the business of, among other things, the design, marketing, sale, and support of batteries with advanced cooling systems. All Cell advertises its batteries on the website http://www.allcelltech.com.

**ANSWER:** Workhorse is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2 of the Complaint and, on that basis, denies all such allegations.

3. IIT is a corporation organized under the laws of the State of Illinois with a place of business at 10 West 35st Street, Chicago, Illinois 60616. IIT is a prestigious, technology-focused research university offering undergraduate and graduate degrees in, among other things, engineering, science, design, human sciences, and applied technology.

**ANSWER:** Workhorse is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3 of the Complaint and, on that basis, denies all such allegations.

4. All Cell and IIT are hereinafter collectively referred to as "Plaintiffs."

**ANSWER:** Workhorse admits that this Complaint purports to refer to All Cell and IIT collectively as "Plaintiffs."

5. On information and belief, Workhorse Motor Works Inc. ("WMW") is a corporation organized under the laws of the State of Indiana with a manufacturing plant located at 940 Indiana State Road 32, Union City, Indiana 47390.

**ANSWER:** WMW admits that it is a corporation organized under the laws of the State of Indiana with a manufacturing plant located at 940 Indiana State Road 32, Union City, Indiana 47390.

6. On information and belief, Workhorse Group Inc. ("WGI") is a publicly traded corporation organized under the laws of the State of Nevada. According to Workhorse Group Inc.'s website, the "Workhorse Headquarters" are located at 100 Commerce Dr., Loveland, Ohio 45140 and the "Workhorse Factory" is located at 940 State Route 32, Union City, Indiana 47390.

**ANSWER:** WGI admits that Workhorse Group Inc. ("WGI") is a publicly traded corporation organized under the laws of the State of Nevada. Workhorse also admits that, according to Workhorse Group Inc.'s website, the "Workhorse Headquarters" are located at 100 Commerce Dr., Loveland, Ohio 45140 and the "Workhorse Factory" is located at 940 State Route 32, Union City, Indiana 47390.

7. On information and belief, Workhorse is in the business of developing and manufacturing electric vehicles and plug-in hybrid vehicles. Workhorse advertises its vehicles on the website http://www.workhorse.com.

**ANSWER:** Workhorse admits that it is in the business of developing and manufacturing electric vehicles and that it lists its vehicles on the website http://www.workhorse.com. Workhorse denies each and every remaining allegation of Paragraph 7.

## JURISDICTION AND VENUE

8. This Court has exclusive jurisdiction over the subject matter of this case under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States.

**ANSWER:** Workhorse states that the allegations set forth in Paragraph 8 of the Complaint are legal conclusions as to which no responsive pleading is necessary. To the extent a response is

required, Workhorse does not contest that the Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a), but only to the extent All Cell and/or IIT have standing to bring the claims set forth in this Complaint. Workhorse denies each and every remaining allegation of paragraph 8.

9. The Court has personal jurisdiction over each of WMW and WGI because each entity has, as discussed in greater detail below, committed acts of patent infringement in this judicial district.

**ANSWER:** Workhorse denies that it has committed any acts of patent infringement in this or any judicial district. Workhorse states that the allegations as to personal jurisdiction set forth in Paragraph 9 of the Complaint are legal conclusions as to which no responsive pleading is necessary. To the extent a response is required, and solely to conserve the resources of the parties and the Court, Workhorse does not contest personal jurisdiction in this Judicial District for the limited purpose of this action only. Workhorse denies each and every remaining allegation of paragraph 9.

10. WMW is an Indiana corporation; has a regular and established place of business in this judicial district at their manufacturing plant located at 940 Indiana State Road 32, Union City, Indiana 47390; has registered with the State of Indiana as a domestic corporation operating in the State of Indiana; and has maintained a registered agent for service of process in this judicial district.

**ANSWER:** WMW admits that WMW has a manufacturing plant located at 940 Indiana State Road 32, Union City, Indiana 47390; has registered with the State of Indiana as a domestic corporation operating in the State of Indiana; and has maintained a registered agent for service of process in this judicial district. WMW denies each and every remaining allegation of paragraph 10.

11. WGI is a Nevada corporation and has a fixed and ongoing place of business in this judicial district at its manufacturing plant located at 940 Indiana State Road 32, Union City, Indiana 47390. In its 2018 10-K annual report filed with the Securities and Exchange Commission, WGI stated:

> Workhorse delivery vans are produced at our Union City, Indiana plant and are in use by our customers on daily routes across the United States. To date, we have built and delivered over 360 electric and range extended medium-duty delivery trucks to our customers.
>
> ***
>
> We intend to produce the W-15 at our existing 250,000 square foot facility in Union City, Indiana. This plant has the capability to produce more than 60,000 vehicles per year.
>
> ***
>
> Our truck assembly facility is located in Union City, Indiana. This facility consists of three buildings with 250,000 square feet of manufacturing and office space on 47 acres.
>
> ***
>
> To date, we are registered as a motor vehicle manufacturer in Indiana and Ohio and as a dealer in California, New York and Chicago.

**ANSWER:** WGI admits that WGI has its manufacturing plant located at 940 Indiana State Road 32, Union City, Indiana 47390. WGI further admits that, in its 2018 10-K annual report filed with the Securities and Exchange Commission, WGI stated:

> Workhorse delivery vans are produced at our Union City, Indiana plant and are in use by our customers on daily routes across the United States. To date, we have built and delivered over 360 electric and range extended medium-duty delivery trucks to our customers.
>
> ***
>
> We intend to produce the W-15 at our existing 250,000 square foot facility in Union City, Indiana. This plant has the capability to produce more than 60,000 vehicles per year.
>
> ***
>
> Our truck assembly facility is located in Union City, Indiana. This facility consists of three buildings with 250,000 square feet of manufacturing and office space on 47 acres.
>
> ***
>
> To date, we are registered as a motor vehicle manufacturer in Indiana and Ohio and as a dealer in California, New York and Chicago.

WGI denies each and every remaining allegation of paragraph 10.

12. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)-(c) and 1400(b). *See, e.g., TC Heartland LLC v. Kraft Foods Group Brands LLC*, 137 S. Ct. 1514 (2017) and *In re Cray Inc.*, 871 F.3d 1355 (Fed. Cir. 2017).

**ANSWER:** Workhorse states that the allegations set forth in Paragraph 12 of the Complaint are legal conclusions as to which no responsive pleading is necessary. To the extent a response is required, and solely to conserve the resources of the parties and the Court, Workhorse does not contest venue in this Judicial District for the limited purpose of this action only. Workhorse denies each and every remaining allegation of paragraph 12.

## BACKGROUND

13. All Cell designs and builds blocks constructed from phase change materials ("PCM"), and these blocks are adapted to house electrochemical cells. During charge and discharge of electrochemical cells heat is produced, and high temperatures produced can adversely affect the functionality and lifespan of the cells. All Cell's thermal management blocks use PCM to surround each electrochemical cell, absorbing and conducting heat away to dramatically extend the life of the cells and prevent fire or damage to the battery.

**ANSWER:** Workhorse is without sufficient information to form a belief as to the allegations set forth in Paragraph 13 of the Complaint and therefore denies the same.

14. As shown in a diagram from WGI's August 2016 investor presentation below, Workhorse's vehicles include numerous Lithium-ion electrochemical cells, and Workhorse uses battery management systems ("BMS") and high-voltage interlock loops ("HVIL") to help control the operating parameters for the numerous electrochemical cells in its vehicles.




*Workhorse Group Inc. Investor Presentation August 2016*

**ANSWER:** WGI admits that the diagram set forth in Paragraph 14's allegation purports to be the diagram from WGI's August 2016 investor presentation. WGI admits that its vehicles include battery cells and a battery management system ("BMS"). WGI is without sufficient information to form a belief as to the allegations set forth in Paragraph 14 of the Complaint and therefore denies the same.

15. All Cell previously provided Workhorse with thermal management blocks for the electrochemical cells in Workhorse's electric vehicles. The All Cell thermal management blocks contained seventy cylindrical spacings, each of which spacings was 18 millimeters in diameter. Panasonic 18650 Li-ion electrochemical cells were embedded into the cylindrical spacings of All Cell's thermal management blocks (shown below with black exterior and empty holes), wrapped in a specialty packaging material, and then welded in parallel with metal busbars on the negative and positive sides.



*All Cell 70P PCC 110062 thermal management block*



*All Cell Thermal Management Blocks with Panasonic 18650 Cells*

**ANSWER:** Workhorse admits that All Cell previously provided Workhorse with thermal management blocks for the electrochemical cells in Workhorse's electric vehicles. Workhorse is without sufficient information to form a belief as to the remaining allegations set forth in Paragraph 15 of the Complaint and therefore denies the same.

16. In or about early 2017, Workhorse ceased purchasing electrochemical cells and thermal management blocks from All Cell and began procuring PCM thermal management blocks, such as the ones shown below, from alternate sources.



*PCM Thermal Management Block from Third Party Provider*

**ANSWER:** Workhorse admits that it ceased purchasing electrochemical cells and thermal management blocks from All Cell in or about early 2017 and began procuring thermal management blocks from an alternate source. Workhorse is without sufficient information to form a belief as to the remaining allegations set forth in Paragraph 16 of the Complaint and therefore denies the same.

**PATENTS-IN-SUIT**

17. On October 22, 2002, the United States Patent and Trademark Office ("USPTO") duly and legally issued U.S. Patent No. 6,468,689 ("the '689 patent") entitled "Thermal Management of Battery Systems." IIT, the owner of the '689 patent, and All Cell, an exclusive licensee of the '689 patent, have standing to sue for infringement of the '689 patent. A copy of the '689 patent is attached as Exhibit A.

**ANSWER:** Paragraph 17 contains legal conclusions and allegations to which no answer is required. To the extent an answer is required, Workhorse admits that what purports to be a copy of the '689 patent is attached as Exhibit A to the Complaint and that the '689 patent is entitled "Thermal Management of Battery Systems" on its face. Workhorse is without sufficient

information to form a belief as to the remaining allegations set forth in Paragraph 17 of the Complaint and therefore denies the same.

18. On September 13, 2005, the USPTO duly and legally issued U.S. Patent No. 6,942,944 (“the ‘944 patent”) entitled “Battery System Thermal Management.” The ‘944 patent is a continuation-in-part of the ‘689 patent. IIT, the owner of the ‘944 patent, and All Cell, an exclusive licensee of the ‘944 patent, have standing to sue for infringement of the ‘944 patent. A copy of the ‘944 patent is attached as Exhibit B.

**ANSWER:** Paragraph 18 contains legal conclusions and allegations to which no answer is required. To the extent an answer is required, Workhorse admits that what purports to be a copy of the ’944 patent is attached as Exhibit B to the Complaint and that the ’944 patent is entitled “Battery System Thermal Management” on its face. Workhorse is without sufficient information to form a belief as to the remaining allegations set forth in Paragraph 18 of the Complaint and therefore denies the same.

19. On September 25, 2012, the USPTO duly and legally issued U.S. Patent No. 8,273,474 (“the ‘474 patent”) entitled “Battery System Thermal Management.” The ‘474 patent is a continuation-in-part of U.S. Patent Application No. 11/225,823, a continuation of the ‘944 patent. IIT, the owner of the ‘474 patent, and All Cell, an exclusive licensee of the ‘474 patent, have standing to sue for infringement of the ‘474 patent. A copy of the ‘474 patent is attached as Exhibit C.

**ANSWER:** Paragraph 19 contains legal conclusions and allegations to which no answer is required. To the extent an answer is required, Workhorse admits that what purports to be a copy of the ’474 patent is attached as Exhibit C to the Complaint and that the ’474 patent is entitled “Battery System Thermal Management” on its face. Workhorse is without sufficient information to form a belief as to the remaining allegations set forth in Paragraph 19 of the Complaint and therefore denies the same.

.

## COUNT I – INFRINGEMENT OF U.S. PATENT NO. 6,468,689

20. Plaintiffs repeat and re-allege the allegations in the preceding paragraphs as though fully set forth herein.

**ANSWER:** Workhorse incorporates by reference its responses in the preceding paragraphs as though fully set forth herein.

21. Workhorse has infringed and continues to infringe at least method claims 1-6 and 8 of the '689 patent within the meaning of 35 U.S.C. § 271(a) by, at least, performing the methods recited in such claims upon the use by Workhorse, its employees, agents, and representatives of Workhorse of electric vehicles that include PCM thermal management blocks or matrices, including, at least, Workhorse's NGEN-1000 delivery van, W-88 delivery van, W-15 electric pickup truck, SureFly personal helicopter, and HorseFly delivery drone (collectively, the "Accused Products"). The Accused Products contain each and every element of at least claims 1-6 and 8 of the '689 patent both literally and under the doctrine of equivalents in contravention of 35 U.S.C. § 271.

**ANSWER:** Workhorse denies the allegations set forth in Paragraph 21 of the Complaint.

22. Workhorse's infringing uses of the recited methods of at least claims 1-6 and 8 of the '689 patent, as described in paragraph 21 above, have occurred during, at least, Workhorse's demonstration, testing, and/or development of the Accused Products. By way of just one example and not limitation, Workhorse has previously "collaborated on a test run of 450-square-foot electric vans that were used in and around San Francisco. Those trials have helped [Workhorse and the company with which it collaborated, Prefix Corporation,] understand how to reduce the weight of the vehicles to improve mileage, performance, and driver safety while reducing the demand on the charging infrastructure."[1]

**ANSWER:** Workhorse denies the allegations set forth in Paragraph 22 of the Complaint.

23. Subject to additional information obtained during discovery, the Court's construction of any patent claim terms about whose meaning the parties disagree, and the detailed infringement contentions Plaintiffs will make pursuant to this district's *Instructions for Preparing Case Management Plan in Patent Cases*, the Accused Products infringe the asserted claims as follows: the Accused Products practice every limitation of claim 1 of the '689 patent – i.e., the electrochemical cells [A] are discharged to power the Workhorse vehicles, and in the process of discharging the cells [A] a quantity of heat is produced. The PCM thermal management block [B] is in thermal contact with the cells [A] and absorbs a portion of the heat produced while the cells are discharging. Following discharge, such as when the Workhorse vehicle is stopped at a delivery

[1] *See, e.g.,* https://cleantechnica.com/2019/04/12/workhorse-partners-with-prefix-corporation-as-ngen-electric-delivery-van-nears-production/

location, the PCM thermal management block [B] releases a portion of the absorbed heat back into the electrochemical cells [A]. When the vehicle moves again, such as when the vehicle heads to the next delivery location in a delivery route, the electrochemical cells [A] are discharged at an elevated temperature to power the vehicle.




**ANSWER:** Workhorse denies the allegations set forth in Paragraph 23 of the Complaint.

24. As discussed above, All Cell and Workhorse had a previous business relationship with respect to technology utilizing the PCM thermal management methods covered by the claims of the '689 patent. As a result of that business relationship, Workhorse had and has direct knowledge of the applicability of the '689 patent to its Accused Products.

**ANSWER:** Workhorse admits that Workhorse previously procured from All Cell thermal management blocks for electrochemical cells. Workhorse denies the remaining allegations set forth in Paragraph 24 of the Complaint.

25. Notwithstanding its direct knowledge of the applicability of the '689 patent to its Accused Products, Workhorse has indirectly infringed and continues to indirectly infringe at least claims 1-6 and 8 of the '689 patent under 35 U.S.C. § 271(b) by knowingly and actively inducing the infringement of those claims by others. Workhorse has knowingly and actively induced infringement of at least claims 1-6 and 8 of the '689 patent, for example, through the foregoing activities including, without limitation, offering to sell and selling the Accused Products in the United States, and by instructing, aiding, assisting, and encouraging the use of the Accused Products in a manner that infringes at least claims 1-6 and 8 of the '689 patent. The direct infringers that are being induced by Workhorse include, without limitation, Workhorse's customers that use the Accused Products in the United States.

**ANSWER:** Workhorse denies the allegations set forth in Paragraph 25 of the Complaint.

26. Notwithstanding its direct knowledge of the applicability of the ‘689 patent to its Accused Products, Workhorse has also indirectly infringed and continues to indirectly infringe at least claims 1-6 and 8 of the ‘689 patent under 35 U.S.C. § 271(c) by knowingly and actively contributing to the infringement of those claims by others. Workhorse has knowingly and actively contributed to the infringement of at least claims 1-6 and 8 of the ‘689 patent by others, for example, without limitation, by offering to sell and selling the Accused Products in the United States, and by instructing, aiding, assisting, and encouraging the use of the Accused Products in a manner that infringes at least claims 1-6 and 8 of the ‘689 patent, where such Accused Products and their components provided by Workhorse constitute a material part of the patented invention of at least claims 1-6 and 8 of the ‘689 patent, which Workhorse knows is especially made or adapted for use in an infringement of at least claims 1-6 and 8 of the ‘689 patent, and which is not a staple article of commerce suitable for substantial non-infringing use. The direct infringers with respect to whose infringement Workhorse has contributed under 35 U.S.C. § 271(c) include, without limitation, Workhorse’s customers that use the Accused Products in the United States.

**ANSWER:** Workhorse denies the allegations set forth in Paragraph 26 of the Complaint.

27. Workhorse’s infringement of, knowing and intentional inducement to infringe, and/or contributory infringement of, the ‘689 patent has injured Plaintiffs and Plaintiffs are entitled to recover damages adequate to compensate them for such infringement, but in no event less than a reasonable royalty, as permitted under 35 U.S.C. § 284.

**ANSWER:** Workhorse denies the allegations set forth in Paragraph 27 of the Complaint.

28. Workhorse’s ongoing infringement of, knowing and intentional inducement to infringe, and/or contributory infringement of, the ‘689 patent has been willful, deliberate, and objectively reckless.

**ANSWER:** Workhorse denies the allegations set forth in Paragraph 28 of the Complaint.

29. Plaintiffs have complied with 35 U.S.C. § 287 to the extent required by law with respect to the ‘689 patent.

**ANSWER:** Workhorse is without sufficient information to form a belief as to the allegations set forth in Paragraph 29 of the Complaint and therefore denies the same.

## COUNT II – INFRINGEMENT OF U.S. PATENT NO. 6,942,944

30. Plaintiffs repeat and re-allege the allegations in the preceding paragraphs as though fully set forth herein.

**ANSWER:** Workhorse incorporates by reference its responses in the preceding paragraphs as though fully set forth herein.

31. Workhorse has infringed and continues to infringe the ‘944 patent by, at least, making, using, offering for sale, and selling throughout the United States, including within this judicial district, the Accused Products.

**ANSWER:** Workhorse denies the allegations set forth in Paragraph 31 of the Complaint.

32. By way of example, as shown below, the Accused Products include every limitation of claim 1 of the ‘944 patent – i.e., the Accused Products include housings [A] and a plurality of Panasonic 18650 Li-ion battery cells [B] within the housing. A PCM block [C] is also contained within the housing and is in thermal contact with the plurality of electrochemical cells [B]. When the electrochemical cells [B] are charged or discharged, a PCM block [C] absorbs a portion of the heat generated by the electrochemical cells [B]. Upon information and belief, the PCM block includes a graphite or similarly thermally conductive lattice that assists in equalizing the temperature across the PCM block. The PCM is disposed within openings of the lattice.






**ANSWER:** Workhorse denies the allegations set forth in Paragraph 32 of the Complaint.

33. Workhorse has infringed and continues to infringe at least claims 1, 2, 15, 16, 2123, and 26 of the ‘944 patent within the meaning of 35 U.S.C. § 271(a) through the foregoing activities including, without limitation, making, using, offering for sale, and selling the Accused Products throughout the United States. The Accused Products contain each and every element of at least claims 1, 2, 15, 16, 21-23, and 26 of the ‘944 patent both literally and under the doctrine of equivalents in contravention of 35 U.S.C. § 271.

**ANSWER:** Workhorse denies the allegations set forth in Paragraph 33 of the Complaint.

34. As discussed above, All Cell and Workhorse had a previous business relationship with respect to technology utilizing the battery systems covered by the claims of the ‘944 patent. As a result of that business relationship, Workhorse had and has direct knowledge of the applicability of the ‘944 patent to its Accused Products.

**ANSWER:** Workhorse admits that Workhorse previously procured from All Cell thermal management blocks for electrochemical cells. Workhorse denies the remaining allegations set forth in Paragraph 34 of the Complaint.

35. Notwithstanding its direct knowledge of the applicability of the ‘944 patent to its Accused Products, Workhorse has indirectly infringed and continues to indirectly infringe at least claims 1, 2, 15, 16, 21-23, and 26 of the ‘944 patent under 35 U.S.C. § 271(b) by knowingly and actively inducing infringement of those claims by others. Workhorse has knowingly and actively induced infringement of at least claims 1, 2, 15, 16, 21-23, and 26 of the ‘944 patent, for example, through the foregoing activities including, without limitation, offering to sell and selling the Accused Products in the United States, and by instructing, aiding, assisting, and encouraging the offer for sale, sale, and use of the Accused Products in a manner that infringes at least claims 1, 2, 15, 16, 21-23, and 26 of the ‘944 patent. The direct infringers that are being induced by Workhorse include, without limitation, Workhorse’s customers that use the Accused Products in the United States.

**ANSWER:** Workhorse denies the allegations set forth in Paragraph 35 of the Complaint.

36. Notwithstanding its direct knowledge of the applicability of the ‘944 patent to its Accused Products, Workhorse has also indirectly infringed and continues to indirectly infringe at least claims 1, 2, 15, 16, 21-23, and 26 of the ‘944 patent under 35 U.S.C. § 271(c) by knowingly and actively contributing to the infringement of those claims by others. Workhorse has knowingly and actively contributed to the infringement of at least claims 1, 2, 15, 16, 21-23, and 26 of the ‘944 patent by others, for example, without limitation, by offering to sell and selling the Accused Products in the United States and by instructing, aiding, assisting, authorizing, advertising, marketing, promoting, providing for, and/or encouraging the offer for sale, sale, and use of the

Accused Products, where such Accused Products and their components provided by Workhorse constitute a material part of the patented invention of at least claims 1, 2, 15, 16, 21-23, and 26 of the '944 patent, which Workhorse knows is especially made or adapted for use in an infringement of at least claims 1, 2, 15, 16, 21-23, and 26 of the '944 patent, and which is not a staple article of commerce suitable for substantial non-infringing use. The direct infringers with respect to whose infringement Workhorse has contributed under 35 U.S.C. § 271(c) include, without limitation, Workhorse's customers that use the Accused Products in the United States.

**ANSWER:** Workhorse denies the allegations set forth in Paragraph 36 of the Complaint.

37. Workhorse's infringement of, knowing and intentional inducement to infringe, and/or contributory infringement of, the '944 patent has injured Plaintiffs and Plaintiffs are entitled to recover damages adequate to compensate them for such infringement, but in no event less than a reasonable royalty, as permitted under 35 U.S.C. § 284.

**ANSWER:** Workhorse denies the allegations set forth in Paragraph 37 of the Complaint.

38. Workhorse's ongoing infringement of, knowing and intentional inducement to infringe, and/or contributory infringement of, the '944 patent has been willful, deliberate, and objectively reckless.

**ANSWER:** Workhorse denies the allegations set forth in Paragraph 38 of the Complaint.

39. Plaintiffs have complied with 35 U.S.C. § 287 to the extent required by law with respect to the '944 patent.

**ANSWER:** Workhorse is without sufficient information to form a belief as to the remaining allegations set forth in Paragraph 39 of the Complaint and therefore denies the same.

## COUNT III – INFRINGEMENT OF U.S. PATENT NO. 8,273,474

40. Plaintiffs repeat and re-allege the allegations in the preceding paragraphs as though fully set forth herein.

**ANSWER:** Workhorse incorporates by reference its responses in the preceding paragraphs as though fully set forth herein.

41. Workhorse has infringed and continues to infringe the '474 patent by, at least, making, using, offering for sale, and selling throughout the United States, including within this judicial district, the Accused Products.

**ANSWER:** Workhorse denies the allegations set forth in Paragraph 41 of the Complaint.

42. By way of example, as shown below, the Accused Products include every limitation of claim 1 of the '474 patent – i.e., the Accused Products include an electrochemical cell array comprising a plurality of Panasonic 18650 Li-ion electrochemical cells [A] and a thermal management matrix [B] enveloping the electrochemical cell array [A]. The thermal management matrix [B] includes a PCM, and on information and belief, the thermal management matrix includes a graphite or similarly thermally conductive lattice within the matrix [B]. The matrix [B] dissipates at least a portion of the heat generated by the Panasonic 18650 Li-ion electrochemical cells when they are activated.




**ANSWER:** Workhorse denies the allegations set forth in Paragraph 42 of the Complaint.

43. Workhorse has infringed and continues to infringe at least claims 1-3, 5, 7, 9-12, and 15-19 of the '474 patent within the meaning of 35 U.S.C. § 271(a) through the foregoing activities including, without limitation, making, using, offering for sale, and selling the Accused Products throughout the United States. The Accused Products contain each and every element of at least claims 1-3, 5, 7, 9-12, and 15-19 of the '474 patent both literally and under the doctrine of equivalents in contravention of 35 U.S.C. § 271.

**ANSWER:** Workhorse denies the allegations set forth in Paragraph 43 of the Complaint.

44. As discussed above, All Cell and Workhorse had a previous business relationship with respect to technology utilizing the battery systems covered by the claims of the '474 patent. As a result of that business relationship, Workhorse had and has direct knowledge of the applicability of the '474 patent to its Accused Products.

**ANSWER:** Workhorse admits that Workhorse previously procured from All Cell thermal management blocks for electrochemical cells. Workhorse denies the remaining allegations set forth in Paragraph 44 of the Complaint.

45. Notwithstanding its direct knowledge of the applicability of the ‘474 patent to its Accused Products, Workhorse has indirectly infringed and continues to indirectly infringe at least claims 1-3, 5, 7, 9-12, and 15-19 of the ‘474 patent under 35 U.S.C. § 271(b) by knowingly and actively inducing infringement of those claims by others. Workhorse has knowingly and actively induced infringement of at least claims 1-3, 5, 7, 9-12, and 15-19 of the ‘474 patent, for example, through the foregoing activities including, without limitation, offering to sell and selling the Accused Products in the United States, and by instructing, aiding, assisting, and encouraging the offer for sale, sale, and use of the Accused Products in a manner that infringes at least claims 1-3, 5, 7, 9-12, and 15-19 of the ‘474 patent. The direct infringers that are being induced by Workhorse include, without limitation, Workhorse’s customers that use the Accused Products in the United States.

**ANSWER:** Workhorse denies the allegations set forth in Paragraph 45 of the Complaint.

46. Notwithstanding its direct knowledge of the applicability of the ‘474 patent to its Accused Products, Workhorse has also indirectly infringed and continues to indirectly infringe at least claims 1-3, 5, 7, 9-12, and 15-19 of the ‘474 patent under 35 U.S.C. § 271(c) by knowingly and actively contributing to the infringement of those claims by others. Workhorse has knowingly and actively contributed to the infringement of at least claims 1-3, 5, 7, 9-12, and 15-19 of the ‘474 patent by others, for example, without limitation, by offering to sell and selling the Accused Products in the United States and by instructing, aiding, assisting, authorizing, advertising, marketing, promoting, providing for, and/or encouraging the offer for sale, sale, and use of the Accused Products, where such Accused Products and their components provided by Workhorse constitute a material part of the patented invention of at least claims 1-3, 5, 7, 9-12, and 15-19 of the ‘474 patent, which Workhorse knows is especially made or adapted for use in an infringement of at least claims 1-3, 5, 7, 9-12, and 15-19 of the ‘474 patent, and which is not a staple article of commerce suitable for substantial non-infringing use. The direct infringers with respect to whose infringement Workhorse has contributed under 35 U.S.C. § 271(c) include, without limitation, Workhorse’s customers that use the Accused Products in the United States.

**ANSWER:** Workhorse denies the allegations set forth in Paragraph 46 of the Complaint.

47. Workhorse’s infringement of, knowing and intentional inducement to infringe, and/or contributory infringement of, the ‘474 patent has injured Plaintiffs and Plaintiffs are entitled to recover damages adequate to compensate them for such infringement, but in no event less than a reasonable royalty, as permitted under 35 U.S.C. § 284.

**ANSWER:** Workhorse denies the allegations set forth in Paragraph 47 of the Complaint.

48. Workhorse's ongoing infringement of, knowing and intentional inducement to infringe, and/or contributory infringement of, the '474 patent has been willful, deliberate, and objectively reckless.

**ANSWER:** Workhorse denies the allegations set forth in Paragraph 48 of the Complaint.

49. Plaintiffs have complied with 35 U.S.C. § 287 to the extent required by law with respect to the '474 patent.

**ANSWER:** Workhorse is without sufficient information to form a belief as to the remaining allegations set forth in Paragraph 49 of the Complaint and therefore denies the same.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, All Cell and IIT, respectfully ask this Court to enter judgment against Defendants, WMW and WGI, and against each of their subsidiaries, successors, parents, affiliates, officers, directors, agents, servants, employees, and all persons in active concert or participation with WMW and WGI, granting the following relief:

A. The entry of judgment in favor of Plaintiffs and against WMW and WGI;

B. An award of damages adequate to compensate Plaintiffs for the infringement that has occurred, and in no event less than a reasonable royalty as permitted by 35 U.S.C. § 284, together with prejudgment interest; and

C. Such other relief that Plaintiffs are entitled to under law, and any other and further relief that this Court or a jury may deem just and proper.

**ANSWER:** Workhorse denies that Plaintiffs are entitled to the relief requested or to any other relief against Workhorse and further prays that Plaintiffs' Complaint be dismissed with prejudice and that Plaintiff take nothing by way of its suit against Workhorse. To the extent a

further response to Plaintiffs' prayer is necessary, Workhorse denies each and every allegation set forth in Plaintiffs' Prayer for Relief (paragraphs A through C, inclusive).

## **SEPARATE DEFENSES**

As separate and distinct defenses to the Complaint, to each and every purported claim thereof, and without admitting or acknowledging that it bears the burden of proof as to any of them, Defendants Workhorse Motor Works Inc. and Workhorse Group Inc. (collectively, "Workhorse") alleges:

### **First Affirmative Defense**
(Non-infringement)

Workhorse has not infringed and does not infringe any claims of the U.S. Patent No. 6,468,689 ("the '689 patent"); U.S. Patent No. 6,942,944 ("the '944 patent"); and U.S. Patent No. 8,273,474 ("the '474 patent") (collectively, "the Patents-in-Suit") – directly, indirectly, literally, or under the doctrine of equivalents.

### **Second Affirmative Defense**
(Lack of patent-eligibility)

One or more claims of the Patents-in-Suit are invalid under 35 U.S.C. § 101 for being drawn to patent-ineligible subject matter. For example, the asserted method claims 1-6 and 8 of the '689 patent; asserted method claims 21-23 and 26 of '944 patent; and asserted method claim 17 of the '474 patent (collectively, "Asserted Method Claims") are directed to a law of nature, *i.e.* the natural law of heat exchange or heat flow between a battery cell and a phase change material. Furthermore, the Asserted Method Claims apply the natural law using the following routine, conventional, well-understood activity: (1) the combination of a phase change material and a battery; (2) operation of a battery; (3) a heat-conductive lattice member; and (4) certain dependent

claim features. The routine, conventional activity does not transform a patent-ineligible law of nature into a patent-eligible application of the natural law.

**Third Affirmative Defense**
(Invalidity Pursuant to 35 U.S.C. § 102)

At least one or more of the claims of each of the Patents-in-Suit is/are invalid for failure to meet the statutory requirements set forth in 35 U.S.C. § 102.

**Fourth Affirmative Defense**
(Invalidity Pursuant to 35 U.S.C. § 103)

At least one or more of the claims of each of the Patents-in-Suit is/are invalid for failure to meet the statutory requirements set forth in 35 U.S.C. § 103. The claims of the Patents-in-Suit invalid as obvious by prior art.

For example, with regard to the ’689 patent, U.S. Patent No. 4,329,407 to Gross et al. (“Gross”) discloses that electrochemical storage batteries operate at elevated temperatures such that during charging and discharging undesired temperature increases occur frequently which are caused by the internal electric resistance of such batteries. (Gross, 5:10-16). Gross also discloses that the interspace inside the cylinder surface of the storage cell is filled with a heat storage medium consisting, for instance, of fire clay material or salt mixtures such that the fire clay, oil, a salt or salt mixture when in the range of operating temperature of the storage cell is subject to a phase change such as melting or solidification. (Gross, 3:5-11). Next, U.S. Patent No. 4,883,726 to Peled et al. (“Peled”) discloses that a heat transfer material inserted into the free space between the cells in the battery pack and the heat absorption material (such as paraffin, wax, tar, or the like) is solid up to a predetermined temperature. (Peled, 1:28:38). Further, U.K. Patent Pub. No. GB2289976 to Bourne (“Bourne”) discloses a battery in which the circulation of heat transfer through cooling elements transfers heat from overheated elements to those that are at a lower

temperature thereby maximizing the heat absorbing potential of the phase change material. (Bourne, Page 7, ll.8-12). In addition, Gross discloses that the removed heat is not lost but is used during pauses in operation for keeping the storage battery hot. (Gross, 3:1-10).

Further, Peled discloses a multi-cell battery comprising a housing and a plurality of electrochemical cells of cylindrical cross section positioned in the housing with an electrically insulating substance provided in the space between the cells that is a solid having a melting point and capable of taking up heat and transferring heat from one cell to the others. (Peled, claim 1). Gross discloses that the operating temperature of the battery of the sodium and sulfur type is for instance about 300C and during charging and discharging the undesired temperature increases occur frequently which are caused by internal electric resistance of such batteries. (Gross, 5:10-16). Both Gross and Peled disclose that a supply of phase change material is contained within the housing and in thermal contact with the electrochemical cell elements as claimed in the ’689 patent.

Further, with regard to the ’944 patent, U.S. Patent No. 4,022,952 to Fritts (“Fritts”) discloses that the heat sink material impregnating the porous matrix is a thermal phase-change material with a high heat of fusion and melts at a temperature slightly lower than the battery limiting material. (Fritts, 2:48-59). Fritts also discloses that the space is filled with a reticulated or a wire or a honeycomb such that a network of porous metal whose interstices are filled with a heat absorbent material. (Fritts, 2:19-24). Fritts further discloses that the heat sink material impregnating the porous matrix preferably should be a thermal phase-change material with a high heat of fusion and melt at a temperature slightly lower than the battery limiting temperature. (Fritts, 2:48-59). Moreover, Bourne and Gross disclose following discharge, a portion of the absorbed quantity of heat from the phase change material is discharged to heat the at least one cell element. “A Novel Thermal Management System” (manuscript submitted to IEEE on January 10,

2000) to Hallaj et al. ("Hallaj") discloses that the heat stored in the PCM enables the cell temperature to remain higher than the surrounding temperature during relaxation thereby the effective capacity during a subsequent charge or discharge is higher. (Hallaj, Page 3235, col. 1).

With regard to the '474 patent, for example, Peled and Gross disclose a battery system comprising an electrochemical cell array with a plurality of electrochemical cell elements. U.S. Patent No. 7,270,910 to Yahnker et al. ("Yahnker") discloses utilizing micro phase-change crystals to form a highly efficient heat sink and the heat sink is formed from a heat conductive material such as aluminum, copper, or carbon fiber with micro-phase change crystals dispersed throughout the matrix. (Yahnker, 12:32-41). Yahnker further discloses that as the battery cell gives off heat, the heat is transferred to the gel tube and once the gel tube reaches the melt temperature of the wax, the phase change begins and as the wax melts the wax will absorb the heat. (Yahnker, 11:13-19).

With regard to the '474 patent, for example, Peled discloses a multi-cell battery comprising a housing, a plurality of electrochemical cells of cylindrical cross section positioned in the housing with the cells having lithium. (Peled, Claim 1). As noted above, Yahnker and Peled disclose a thermal management matrix at least in part in thermal contact with at least one of the lithium-based electrochemical cell elements of the electrochemical cell array. As noted above with regard to Yahnker and as the same as the '944 patent claims, Yahnker and Fritts disclose at least a portion of the supply of phase change material disposed in a heat conductive lattice member.

Further, with regard to the '474 patent, Peled discloses that a heat transfer material is inserted into the free space between the cells in the battery pack and the heat absorption material melts and transfers the released heat to all cells in the battery thereby increasing the available heat capacity and thermal runaway conditions are avoided. (Peled, 1:28-40). As noted above, Yahnker

discloses dissipating heat produced by at least a first electrochemical cell element of the electrochemical cell array via a thermal management matrix at least in part enveloping at least the first and electrochemical cell elements of the electrochemical cell array. As noted above, Yahnker and Fritts disclose the thermal management matrix comprises a supply of phase change material at least in part disposed in a heat conductive lattice member. Gross discloses that the removed heat is not lost but is used during pauses in operation for keeping the storage battery hot. (Gross, 3:1-10).

**Fifth Affirmative Defense**
(Invalidity Pursuant to 35 U.S.C. § 112)

Each of the Patents-in-Suit does not meet the requirements set forth in 35 U.S.C. § 112 and is invalid and void against Workhorse, for either or both of the following reasons:

(a) The specifications of the Patents-in-Suit are incomplete, vague and indefinite and do not contain a written description of the alleged inventions, and of the manner and process of making and using them, in such full, clear, concise and exact terms as to enable a person skilled in the art to which it pertains, to make and use the same; and

(b) The claims of the Patents-in-Suit are vague and indefinite and fail to particularly point out and distinctly claim the subject matter of the alleged invention.

**Sixth Affirmative Defense**
(Limitation on Damages Pursuant to 35 U.S.C. § 286)

Any recovery by Plaintiffs is limited by 35 U.S.C. § 286 to any alleged infringement that occurred within the limitations period of six years prior to the filing of the Complaint.

**Seventh Affirmative Defense**
(Failure to Mark Pursuant to 35 U.S.C. § 287)

Any recovery by Plaintiffs is limited to any alleged infringement that occurred after the filing of the Complaint or after Plaintiffs provided actual notice of the Patents-in-Suit, as Plaintiffs, the

prior owners of the Patents-in-Suit, and/or their licensees have failed to mark any products made under the Patents-in-Suit in conformance with the requirements of 35 U.S.C. § 287.

**Eighth Affirmative Defense**
(Unclean Hands)

Plaintiffs' claims are barred by the equitable doctrine of unclean hands.

**Ninth Affirmative Defense**
(Prosecution History Estoppel and Prosecution Disclaimer)

Plaintiffs' claims are barred in whole or in part under the doctrines of prosecution history estoppel and/or prosecution disclaimer.

**Tenth Affirmative Defense**
(Patent Misuse)

Plaintiffs' claims are barred under the doctrine of patent misuse.

**Eleventh Affirmative Defense**
(Waiver, Implied License, Estoppel, and Acquiescence)

Plaintiffs' claims are barred by the doctrines of waiver, acquiescence, implied license, and/or equitable estoppel.

**Twelfth Affirmative Defense**
(Failure to State a Claim )

Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

**Thirteenth Affirmative Defense**
(Lack of Standing)

Plaintiffs lack standing to assert the Patents-in-Suit.

**Fourteenth Affirmative Defense**
(Limitation on Indirect Infringement Claims)

To the extent Plaintiffs' Complaint includes any claims of indirect infringement, such claims are barred because the Complaint does not allege that Workhorse: (i) had actual knowledge

of the Patents-in-Suit; (ii) had actual knowledge of the alleged infringement of the Patents-in-Suit by any third parties; and (iii) had any specific intent for any third parties to infringe the Patents-in-Suit.

**Fifteenth Affirmative Defense**
(License)

Plaintiffs' claims are barred because Workhorse, its suppliers, and/or its customers are licensed.

**Sixteenth Affirmative Defense**
(Judicial Estoppel, Collateral Estoppel, and Law of the Case)

Plaintiffs' claims are barred in whole or in part under the doctrines of judicial estoppel, collateral estoppel, and/or law of the case.

**Seventeenth Affirmative Defense**
(Unenforceability Based on Inequitable Conduct)

The Patents-in-Suit are unenforceable because Plaintiffs, the named inventors on the faces of the Patents-in-Suit, and/or their representatives failed to comply with their duty of candor and good faith in dealing with the USPTO. The details surrounding Plaintiffs' inequitable conduct are explained in paragraphs 31-143 of Workhorse's Counterclaims below, which are incorporated by reference herein.

**Eighteenth Affirmative Defense**
(No Willful Infringement and Enhanced Damages)

Plaintiffs are not entitled to a willful infringement finding and enhanced damages because Plaintiffs have failed to plead the requirements for willful infringement and enhanced damages. Further, Plaintiffs are not entitled to assert a charge of willful infringement and request enhanced damages because Plaintiffs cannot show Workhorse's actual knowledge of the Patents-in-Suit prior to Plaintiffs' filing of the Complaint and/or Workhorse's actual knowledge of the alleged

infringement of the Patents-in-Suit, prior to Plaintiffs' filing of the Complaint. Any claim and recovery for willful infringement is limited to the period after which Plaintiffs can make such a showing.

## DEFENDANTS WORKHORSE MOTOR WORKS INC.'S AND WORKHORSE GROUP INC.'S COUNTERCLAIMS

For its Counterclaims against All Cell Technologies, LLC ("All Cell") and Illinois Institute of Technology ("IIT") (collectively, "Plaintiffs"), Counterclaim-Plaintiffs Workhorse Motor Works Inc. and Workhorse Group Inc. (collectively "Workhorse") by their undersigned counsel, allege as follows:

## THE PARTIES

1. Counterclaim-Plaintiff Workhorse Motor Works Inc. ("WMW") is a corporation organized under the laws of the State of Indiana with a manufacturing plant located at 940 Indiana State Road 32, Union City, Indiana 47390.

2. Counterclaim-Plaintiff Workhorse Group Inc. ("WGI") is a publicly traded corporation organized under the laws of the State of Nevada.

3. On information and belief, Counterclaim-Defendant All Cell Technologies, LLC ("All Cell") is a limited liability company organized under the laws of the State of Illinois with a place of business at 2321 West 41st Street, Chicago, Illinois 60609.

4. On information and belief, Counterclaim-Defendant Illinois Institute of Technology ("IIT"), is a corporation organized under the laws of the State of Illinois with a place of business at 10 West 35st Street, Chicago, Illinois 60616.

**JURISDICTION**

5. Counterclaim-Plaintiff Workhorse's Counterclaims are for declarations of non-infringement, invalidity, and/or unenforceability of U.S. Patent Nos. 6,468,689 ("'689 patent"); 6,942,944 ("'944 patent"); and 8,273,474 ("'474 patent") (collectively, the "Patents-in-Suit"). Accordingly, this Court has subject matter jurisdiction over the Counterclaim-Plaintiff's Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202, as well as the Patent Act, 35 U.S.C. § 1, *et seq.*

6. Plaintiffs/Counterclaim-Defendants have submitted themselves to this Court's jurisdiction by alleging, in the present lawsuit, that Workhorse infringes the Patents-in-Suit. Accordingly, an actual case or controversy between Counterclaim-Plaintiff Workhorse and Plaintiffs/Counterclaim-Defendants exists and is of such immediacy and reality to warrant the issuance of a declaratory judgment.

**COUNT I**
**DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 6,468,689**

7. Counterclaim-Plaintiff Workhorse incorporates and realleges the allegations set forth in Counterclaim Paragraphs 1-6, above, as if set forth fully herein.

8. Counterclaim-Plaintiff Workhorse does not infringe and has not infringed, directly or indirectly, literally or pursuant to the doctrine of equivalents, any claim of U.S. Patent No. 6,468,689.

9. Counterclaim-Plaintiff Workhorse seeks a declaratory judgment that it has not and does not infringe any claim of the '689 patent.

**COUNT II**
**DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 6,468,689**

10. Counterclaim-Plaintiff Workhorse incorporates and realleges the allegations set forth in the foregoing Counterclaim Paragraphs, above, as if set forth fully herein.

11. The claims of the ’689 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

12. For example, the asserted method claims 1-6 and 8 of the ’689 patent are directed to a law of nature, *i.e.* the natural law of heat exchange or heat flow between a battery cell and a phase change material. Furthermore, the claims apply the natural law using the following routine, conventional, well-understood activity: (1) the combination of a phase change material and a battery; (2) operation of a battery; (3) a heat-conductive lattice member; and (4) certain dependent claim features. The routine, conventional activity does not transform a patent-ineligible law of nature into a patent-eligible application of the natural law.

13. Further, the claims of the ’689 patent are rendered invalid as obvious by prior art. For example, U.S. Patent No. 4,329,407 to Gross et al. (“Gross”) discloses that electrochemical storage batteries operate at elevated temperatures such that during charging and discharging undesired temperature increases occur frequently which are caused by the internal electric resistance of such batteries. (Gross, 5:10-16). Gross also discloses that the interspace inside the cylinder surface of the storage cell is filled with a heat storage medium consisting, for instance, of fire clay material or salt mixtures such that the fire clay, oil, a salt or salt mixture when in the range of operating temperature of the storage cell is subject to a phase change such as melting or solidification. (Gross, 3:5-11). Next, U.S. Patent No. 4,883,726 to Peled et al. (“Peled”) discloses

that a heat transfer material inserted into the free space between the cells in the battery pack and the heat absorption material (such as paraffin, wax, tar, or the like) is solid up to a predetermined temperature. (Peled, 1:28:38). Further, U.K. Patent Pub. No. GB2289976 to Bourne ("Bourne") discloses a battery in which the circulation of heat transfer through cooling elements transfers heat from overheated elements to those that are at a lower temperature thereby maximizing the heat absorbing potential of the phase change material. (Bourne, Page 7, ll.8-12). In addition, Gross discloses that the removed heat is not lost but is used during pauses in operation for keeping the storage battery hot. (Gross, 3:1-10). Further, Peled discloses a multi-cell battery comprising a housing and a plurality of electrochemical cells of cylindrical cross section positioned in the housing with an electrically insulating substance provided in the space between the cells that is a solid having a melting point and capable of taking up heat and transferring heat from one cell to the others. (Peled, claim 1). Gross discloses that the operating temperature of the battery of the sodium and sulfur type is for instance about 300C and during charging and discharging the undesired temperature increases occur frequently which are caused by internal electric resistance of such batteries. (Gross, 5:10-16). Both Gross and Peled disclose that a supply of phase change material is contained within the housing and in thermal contact with the electrochemical cell elements as claimed in the '689 patent.

14. Counterclaim-Plaintiff Workhorse seeks a declaratory judgment that the claims of the '689 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

**COUNT III**
**DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 6,942,944**

15. Counterclaim-Plaintiff Workhorse incorporates and realleges the allegations set forth in Counterclaim Paragraphs 1-12, above, as if set forth fully herein.

16. Counterclaim-Plaintiff Workhorse does not infringe and has not infringed, directly or indirectly, literally or pursuant to the doctrine of equivalents, any claim of the ’944 patent.

17. Counterclaim-Plaintiff Workhorse seeks a declaratory judgment that it has not and does not infringe any claim of the ’944 patent.

**COUNT IV**
**DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 6,942,944**

18. Counterclaim-Plaintiff Workhorse incorporates and realleges the allegations set forth in the foregoing Counterclaim Paragraphs, above, as if set forth fully herein.

19. The claims of the ’944 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

20. For example, the asserted method claims 21-23 and 26 of ’944 patent are directed to a law of nature, i.e. the natural law of heat exchange or heat flow between a battery cell and a phase change material. Furthermore, the Asserted Method Claims apply the natural law using the following routine, conventional, well-understood activity: (1) the combination of a phase change material and a battery; (2) operation of a battery; (3) a heat-conductive lattice member; and (4) certain dependent claim features. The routine, conventional activity does not transform a patent-ineligible law of nature into a patent-eligible application of the natural law.

21. Further, the claims of the ’944 patent are rendered invalid as obvious by prior art. For example, U.S. Patent No. 4,022,952 to Fritts (“Fritts”) discloses that the heat sink material impregnating the porous matrix is a thermal phase-change material with a high heat of fusion and melts at a temperature slightly lower than the battery limiting material. (Fritts, 2:48-59). Fritts also discloses that the space is filled with a reticulated or a wire or a honeycomb such that a network of porous metal whose interstices are filled with a heat absorbent material. (Fritts, 2:19-24). Fritts further discloses that the heat sink material impregnating the porous matrix preferably should be a thermal phase-change material with a high heat of fusion and melt at a temperature slightly lower than the battery limiting temperature. (Fritts, 2:48-59). Moreover, Bourne and Gross disclose following discharge, a portion of the absorbed quantity of heat from the phase change material is discharged to heat the at least one cell element. “A Novel Thermal Management System” (manuscript submitted to IEEE on January 10, 2000) to Hallaj et al. (“Hallaj”) discloses that the heat stored in the PCM enables the cell temperature to remain higher than the surrounding temperature during relaxation thereby the effective capacity during a subsequent charge or discharge is higher. (Hallaj, Page 3235, col. 1).

22. Counterclaim-Plaintiff Workhorse seeks a declaratory judgment that the claims of the ’944 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

**COUNT V**
**DECLARATORY JUDGMENT OF NON-INFRINGEMENT**
**OF U.S. PATENT NO. 8,273,474**

23. Counterclaim-Plaintiff Workhorse incorporates and realleges the allegations set forth in Counterclaim Paragraphs 1-18, above, as if set forth fully herein.

24. Counterclaim-Plaintiff Workhorse does not infringe and has not infringed, directly or indirectly, literally or pursuant to the doctrine of equivalents, any claim of U.S. Patent No. 8,273,474.

25. Counterclaim-Plaintiff Workhorse seeks a declaratory judgment that it has not and does not infringe any claim of the '474 patent.

**COUNT VI**
**DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 8,273,474**

26. Counterclaim-Plaintiff Workhorse incorporates and realleges the allegations set forth in the foregoing Counterclaim Paragraphs, above, as if set forth fully herein.

27. The claims of the '474 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

28. For example, the asserted method claim 17 of the '474 patent are directed to a law of nature, i.e. the natural law of heat exchange or heat flow between a battery cell and a phase change material. Furthermore, the Asserted Method Claims apply the natural law using the following routine, conventional, well-understood activity: (1) the combination of a phase change material and a battery; (2) operation of a battery; (3) a heat-conductive lattice member; and (4) certain dependent claim features. The routine, conventional activity does not transform a patent-ineligible law of nature into a patent-eligible application of the natural law.

29. Further, the claims of the '474 patent are rendered invalid as obvious by prior art. For example, Peled and Gross disclose a battery system comprising an electrochemical cell array with a plurality of electrochemical cell elements. U.S. Patent No. 7,270,910 to Yahnker et al. ("Yahnker") discloses utilizing micro phase-change crystals to form a highly efficient heat sink

and the heat sink is formed from a heat conductive material such as aluminum, copper, or carbon fiber with micro-phase change crystals dispersed throughout the matrix. (Yahnker, 12:32-41). Yahnker further discloses that as the battery cell gives off heat, the heat is transferred to the gel tube and once the gel tube reaches the melt temperature of the wax, the phase change begins and as the wax melts the wax will absorb the heat. (Yahnker, 11:13-19). In addition, Peled discloses a multi-cell battery comprising a housing, a plurality of electrochemical cells of cylindrical cross section positioned in the housing with the cells having lithium. (Peled, Claim 1). As noted above, Yahnker and Peled disclose a thermal management matrix at least in part in thermal contact with at least one of the lithium-based electrochemical cell elements of the electrochemical cell array. As noted above with regard to Yahnker and as the same as the '944 patent claims, Yahnker and Fritts disclose at least a portion of the supply of phase change material disposed in a heat conductive lattice member. Further, Peled discloses that a heat transfer material is inserted into the free space between the cells in the battery pack and the heat absorption material melts and transfers the released heat to all cells in the battery thereby increasing the available heat capacity and thermal runaway conditions are avoided. (Peled, 1:28-40). As noted above, Yahnker discloses dissipating heat produced by at least a first electrochemical cell element of the electrochemical cell array via a thermal management matrix at least in part enveloping at least the first and electrochemical cell elements of the electrochemical cell array. As noted above, Yahnker and Fritts disclose the thermal management matrix comprises a supply of phase change material at least in part disposed in a heat conductive lattice member. Gross discloses that the removed heat is not lost but is used during pauses in operation for keeping the storage battery hot. (Gross, 3:1-10).

30. Counterclaim-Plaintiff Workhorse seeks a declaratory judgment that the claims of the ’474 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

**COUNT VII**
**DECLARATORY JUDGMENT OF UNENFORCEABILITY OF U.S. PATENT NO. 6,942,944**

31. Counterclaim-Plaintiff Workhorse incorporates and realleges the allegations set forth in the foregoing Counterclaim Paragraphs, above, as if set forth fully herein.

32. The ’944 patent is one of several related United States patent applications and issued patents in the chain of claimed priority that is shown in the table below in application filing date-order.

| App. No. | Filing Date | Issued Patent | Issue Date | Priority Claim |
|---|---|---|---|---|
| 09/515,268 ("'268 application") | Feb. 29, 2000 | '689 patent | Oct. 22, 2002 | None |
| 10/274,248 ("'248 application") | Oct. 18, 2002 | '944 patent | Sept. 13, 2005 | Continuation-in-part of '268 application |
| 11/255,823 ("'823 application") | Sept. 13, 2005 | NA (Abandoned) | NA | Continuation of '248 application, which is a continuation-in-part of '268 application |
| 60/928,188 ("'188 provisional application") | May 7, 2007 | NA (Expired) | NA | None |
| 12/116,800 ("'800 application") | May 7, 2008 | '474 patent | Sept. 25, 2012 | Continuation-in-part of '823 application, which is a continuation of '248 application, which is a continuation-in-part of '268 application; claims benefit of priority to '188 provisional application |

33. In addition to priority claims, the applications in the chain of claimed priority of the '944 patent share similar titles, and each issued patent incorporates each previous application in the chain of claimed priority by reference, as shown in the table below:

| App. No. | Title | Issued Patent | Incorporation by Reference |
|---|---|---|---|
| ’268 application | Thermal Management of Battery Systems | ’689 patent | None |
| ’248 application | Battery System Thermal Management | ’944 patent | Incorporates ’268 application by reference |
| ’823 application | Battery System Thermal Management | NA (Abandoned) | Incorporates ’268 application by reference |
| ’188 provisional application | Passive (PCM) Thermal Management of Li-Ion Batteries | NA (Expired) | Numerous publications and patents cited and included, including the ‘689 patent, the ‘944 patent, and the ‘823 application |
| ’800 application | Battery System Thermal Management | ’474 patent | Incorporates ’188 provisional application, ’823 application, ’248 application, and ’268 application by reference |

28. The claims and specification of the ’689 patent are generally directed to a battery system including one or more battery cells and a phase change material used to remove heat from, and return heat to, the battery cells.

29. The ’944 patent, a continuation-in-part of the ’689 patent, added disclosure directed to a heat-conductive lattice member in which the phase change material is disposed, and similarly added claim elements directed to the lattice member.

30. The ’474 patent, a continuation-in-part of a continuation of the ’944 patent, added further disclosure directed to a thermal management matrix, and similarly added claim elements directed to the matrix. The ’944 patent is unenforceable because Said Al-Hallaj and Jan Robert Selman (the “Named Inventors”), IIT, and the attorneys who represented IIT and/or the Named Inventors, when involved in the prosecution of the ’944 patent, along with the entire family of related patents and patent applications, deliberately withheld one or more known material prior art references from the Patent and Trademark Office (the “PTO”) during prosecution of the

’944 patent. The single most reasonable inference that a reasonable factfinder can draw from each of these acts is that the deliberate withholding of these material references was done or made with the specific intent to deceive the PTO.

32. During prosecution of the ’944 patent, as well as during prosecution of the entire family of patents and patent applications related to the ’944 patent, including the ’474 patent, the Named Inventors, IIT, and their attorneys and agents, and anyone else responsible for prosecuting the ’474 and ’944 patents (and related patents and applications), knew or should have known that all patent applicants and their counsel are under a duty to act with good faith and candor before the PTO and are required by 37 C.F.R. § 1.56 to disclose material information to the PTO.

33. The attorneys and agents who prosecuted and prosecute the ’474 and ’944 patents on behalf of the Named Inventors and/or IIT, including but not limited to Nick Kottis (“Mr. Kottis”) of Pauley Petersen Kinne & Erickson, are registered patent attorneys who knew or should have known of their duty of good faith and candor before the PTO and the requirement of 37 C.F.R. § 1.56 to disclose material information to the PTO.

**<u>Prosecution and Content of the ’944 Patent</u>**

34. On October 18, 2002, Mr. Kottis filed the ’248 application, entitled “Battery System Thermal Management Cross Reference to Related Application.”

35. On October 18, 2002, Mr. Kottis also filed a Preliminary Amendment that amended the title of the ’248 application to “Battery System Thermal Management.”

36. On October 18, 2002, Mr. Kottis recorded an assignment of the ’248 application from the Named Inventors to IIT with the PTO.

37. The ’248 application eventually issued as the ’944 patent.

38. The ’944 patent lists, on its face, the Named Inventors as the inventors of the ’944 patent.

39. On October 12, 2002, during prosecution of the ’248 application—which eventually issued as the ’944 patent—Mr. Kottis filed with the PTO a declaration that was signed by both of the Named Inventors, in which the Named Inventors acknowledged their duty to disclose information of which they were aware that is material to patentability, including “information that is material to examination of this application which occurred between the filing date of said earlier pending application(s) relied upon under 35 U.S.C. 120 and the filing date of this application.”

40. The ’248 application identifies itself as a continuation-in-part of the ’268 application. The ’268 application eventually issued as the ’689 patent.

41. FIGS. 10-13 of the ’248 application, and of the ’944 patent, are not included in the ’268 application and constitute new matter included in the ’268 application and the ’689 patent.

42. The text appearing at 3:19-48, 4:6-17, and 7:34-14:26 of the ’944 patent is not included in the ’268 application and constitutes new matter included in the ’268 application and the ’689 patent.

43. Claim 1 of the ’944 patent recites, *inter alia*, “a heat-conductive lattice containment member also contained within the housing, the containment lattice member having a plurality of openings wherein at least a portion of the supply of the phase change material is disposed.”

44. The ’268 application and the ’689 patent do not include sufficient disclosure of “a heat-conductive lattice containment member also contained within the housing, the containment lattice member having a plurality of openings wherein at least a portion of the supply of the phase

change material is disposed" to comply with the requirements of 35 U.S.C. § 112. Accordingly, at least claim 1 of the '944 patent is not entitled to any priority date before the filing date of the '248 application, October 18, 2002.

45. Claim 5 of the '944 patent recites, *inter alia*, "wherein the containment lattice member comprises graphite."

46. The '944 patent states that "suitable such phase change materials may generally include paraffin waxes such as are relatively inexpensive, not easily or prone to decomposition and which generally have a relatively low melting temperature within the recommended range of operation for Li-ion cells." ('944 patent at 5:25-28.)

47. On October 18, 2002, Mr. Kottis submitted a First Information Disclosure Statement in the '248 application (which eventually issued as the '944 patent) on behalf of the Named Inventors and/or IIT ("First '944 IDS").

48. On November 12, 2004, Mr. Kottis submitted a Second Information Disclosure Statement in the '248 application (which eventually issued as the '944 patent) on behalf of the Named Inventors and/or IIT ("Second '944 IDS"). No further Information Disclosure Statements were filed by Mr. Kottis, the Named Inventors, and/or IIT in the '248 application.

49. On March 15, 2015, the Examiner issued a Notice of Allowance for the '248 application (which eventually issued as the '944 patent). In the Notice of Allowance, the Examiner stated that "[t]he prior art does not teach the invention, as claimed, including a heat-conductive lattice member having a plurality of openings wherein at least a portion of the supply of the phase change material is disposed contained within the housing."

50. The '944 patent issued on September 13, 2005.

51. The claims of the ’944 patent have significant overlap with the claims of the ’689 patent. Both the ’689 patent and the ’944 patent include an independent claim to a “method of operating a power supply system.” Claim 1 of the ’689 patent is compared to claim 21 of the ’944 patent below, with similar claim elements emphasized.

| ’689 patent | ’944 patent |
|---|---|
| 1. **A method of operating a power supply system, the method comprising:** | 21. **A method of operating a power supply system, the method comprising:** |
| **discharging at least one cell element of a battery module to produce a quantity of power and a quantity of heat,** | **discharging at least one cell element of a battery module to produce a quantity of power and a quantity of heat,** |
| **absorbing at least a portion of the quantity of heat in a phase change material in thermal contact with the discharging cell element,** | **absorbing at least a portion of the quantity of heat in a phase change material in thermal contact with the discharging cell element** |
| | with the phase change material disposed in a plurality of openings in a heat-conductive containment lattice member, |
| **following discharge, releasing at least a portion of the absorbed quantity of heat from the phase change material to heat the at least one cell element**, and | **following discharge, releasing at least a portion of the absorbed quantity of heat from the phase change material to heat the at least one cell element** to a greater than ambient temperature, and |
| **discharging the at least one cell element** at elevated temperature. | subsequently **discharging the** heated **at least one cell element**. |

52. The ’944 patent claims a “phase change material disposed in a plurality of openings in a heat-conductive containment lattice member.” The ’689 patent does not claim a heat-conductive lattice member having a plurality of openings in which a phase change material is disposed.

**Prosecution and Content of the ’474 Patent**

53. On May 7, 2008, Mr. Kottis filed the ’800 application, entitled “Battery System Thermal Management.”

54. On August 28, 2008, Mr. Kottis recorded an assignment of the ’800 application from the Named Inventors to the Illinois Institute of Technology with the PTO.

55. The ’800 application eventually issued as the ’474 patent.

56. The ’474 patent lists, on its face, the Named Inventors as the inventors of the ’474 patent.

57. The face of the ’474 patent identifies the ’474 patent as a continuation-in-part of the ’823 application, now abandoned, and further identifies the ’823 application as a continuation of the ’248 application (which eventually issued as the ’944 patent).

58. The ’474 patent purports to claim priority to provisional application no. 60/928,188, filed on May 7, 2007 (defined above as the “’188 provisional application”).

59. On August 28, 2008, Mr. Kottis submitted a declaration signed by the Named Inventors to the PTO in which the Named Inventors acknowledged their duty to disclose information of which they were aware that is material to patentability.

60. On August 28, 2008, Mr. Kottis submitted a First Information Disclosure Statement in the ’800 application (which eventually issued as the ’474 patent) on behalf of the Named Inventors and/or IIT (“’474 IDS”). No further Information Disclosure Statements were filed in the ’800 application by Mr. Kottis, the Named Inventors, and/or IIT.

61. Figures 14-18 of the ’800 application were not included in the ’823 application and constitute new matter included in the ’800 application and the ’474 patent.

62. Figures 14-18 of the ’800 application were not included in the ’248 application and constitute new matter included in the ’248 application and the ’944 patent.

63. The text at column 16, line 41 through column 18, line 58 of the ’474 patent was not included in the ’823 application and constitutes new matter included in the ’823 application and the ’474 patent.

64. The text at column 16, line 41 through column 18, line 58 of the ’474 patent was not included in the ’248 application and constitutes new matter included in the ’823 application and the ’474 patent.

65. Claim 1 of the ’474 patent recites, *inter alia*, “a thermal management matrix at least in part enveloping the electrochemical cell array and in thermal contact therewith, the thermal management matrix comprising a supply of phase change material disposed at least in part in a heat conductive lattice member.”

66. Neither the ’823 application nor the ’248 application (which eventually issued as the ’944 patent) includes sufficient disclosure of “a thermal management matrix at least in part enveloping the electrochemical cell array and in thermal contact therewith, the thermal management matrix comprising a supply of phase change material disposed at least in part in a heat conductive lattice member” to comply with the requirements of 35 U.S.C. § 112. Accordingly, at least claim 1 of the ’474 patent is not entitled to a priority date any earlier than the filing date of the ’188 provisional application, May 7, 2007.

67. The ’474 patent states that “[p]articular preferred containment lattice member materials for use in the practice of the invention include, for example, . . . aluminum foam.” (’474 patent at 10:65-11:1.)

68. The ’474 patent issued on September 25, 2012.

**<u>Inequitable Conduct for Failure to Disclose the *Py – Paraffin* Reference</u>**

69. Again, because it is relevant to the below-described inequitable conduct, at least claim 1 of the '944 patent is not entitled to any priority date before the filing date of the '248 application, ***October 18, 2002***, and the '944 patent issued on ***September 13, 2005.***

70. One of the Named Inventors, Said Al-Hallaj, is a co-author, along with Andrew Mills, of Mills et al., *Simulation of passive thermal management system for lithium-ion battery packs*, 141 Journal of Power Sources 307-315 (2005) ("*Mills - Simulation*").

71. *Mills – Simulation* was submitted by its authors to the Journal of Power Sources no later than September 14, 2004, while the '248 application was pending in the PTO, and before the '944 patent issued on September 13, 2005.

72. *Mills – Simulation* identifies its authors, Andrew Mills and Said Al-Hallaj, as being affiliated with IIT.

73. *Mills – Simulation* includes a note 6 which lists Py et al., *Paraffin/porous-graphite-matrix composite and a high and constant power thermal storage material*, 44 Int'l Journal of Heat and Mass Transfer 2727-2737 (2001) ("*Py - Paraffin*"). Accordingly, Said Al-Hallaj, a Named Inventor, and IIT (the assignee of the '248 application), had knowledge of *Py - Paraffin* while the '248 application was pending in the PTO and before the '944 patent issued.

74. *Py – Paraffin* discloses, *inter alia*, "[a] new supported phase change material (PCM) made of paraffin impregnated by capillary forces in a compressed natural graphite (CENG) material." *Py – Paraffin* at Abstract. *Py - Paraffin* further discloses that "[e]xpanded graphite powders were poured into a cubic mold of aluminum and then pressed to obtain the porous graphite matrix with the desired bulk density. . . . Each cubic matrix was soaked into melted paraffin and regularly weighted until maximum load was reached." *Py – Paraffin* at 2729. Accordingly, the

disclosure of *Py – Paraffin* includes the exact elements that the Examiner concluded was absent from the prior art when allowing the ’944 patent, namely, “a heat-conductive lattice member having a plurality of openings wherein at least a portion of the supply of the phase change material is disposed.” Accordingly, *Py – Paraffin* would have been material to the Examiner during examination of the ’248 application, which eventually issued as the ’944 patent.

75. *Py – Paraffin* published no later than August 2001—more than a year before the filing date of the ’248 application (which eventually issued as the ‘944 patent), October 18, 2002.

76. *Py – Paraffin* is prior art to the ’944 patent under 35 U.S.C. § 102(b).

77. *Py – Paraffin* includes authors that are not named inventors on the face of the ’474 patent.

78. *Py – Paraffin* is “by another” relative to the ’944 patent for the purposes of 35 U.S.C. § 102(a).

79. *Py – Paraffin* is prior art to the ’944 patent under 35 U.S.C. § 102(a).

80. The Named Inventors are co-authors, along with Andrew Mills and Mohammed Farid, of Mills et al., *Thermal conductivity enhancement of phase change materials using a graphite matrix*, 26 Applied Thermal Engineering 1652-61 (2006) (“*Thermal Conductivity*”).

81. *Thermal Conductivity* identifies the Named Inventors and Andrew Mills as being affiliated with IIT.

82. *Thermal Conductivity* states that “[v]arious methods have been investigated for increasing the thermal conductivity of PCMs. The methods include . . . impregnating a porous graphite matrix with PCM [3,6-8].” *Thermal Conductivity* at 1652. Note 6 in *Thermal Conductivity* refers to *Py – Paraffin*. Accordingly, the Named Inventors and IIT, through the

Named Inventors and Andrew Mills, have explicitly stated that *Py – Paraffin* discloses "impregnating a porous graphite matrix with PCM."

83. The Named Inventors, and IIT (the assignee of the '248 application), understood *Py – Paraffin* to disclose a heat-conductive lattice member having a plurality of openings wherein at least a portion of the supply of the phase change material is disposed before the issuance of the '944 patent. Accordingly, the Named Inventors and IIT knew that *Py – Paraffin* would have been material to the Examiner during examination of the '944 patent.

84. Based on at least the Named Inventors' and IIT's statement in *Thermal Conductivity* that that *Py – Paraffin* discloses "impregnating a porous graphite matrix with PCM," the Named Inventors and IIT knew that *Py – Paraffin* was material to patentability.

85. *Py – Paraffin* was not included in the First '944 IDS or the Second '944 IDS or otherwise disclosed to the PTO during the pendency of the '248 application (which eventually issued as the '944 patent).

86. It is reasonable to conclude that the Named Inventors and IIT, having knowledge of *Py – Paraffin* and knowing that *Py – Paraffin* discloses the exact claim elements that the Examiner of the '944 patent believed to be absent in the prior art, made a deliberate decision to withhold *Py – Paraffin* from the Examiner in order to obtain issuance of the '944 patent and the claims.

87. Based on at least the following three facts, *Py – Paraffin* was but-for material to the '944 patent: (i) the Examiner stated, when allowing the '248 application that "[t]he prior art does not teach the invention, as claimed, including a heat-conductive lattice member having a plurality of openings wherein at least a portion of the supply of the phase change material is disposed"; (ii) the '944 patent specifically identifies graphite as a material for the lattice

member and paraffin as a phase change material; and (iii) *Py – Paraffin* discloses a "porous graphite matrix" that is "soaked into melted paraffin."

88. It is reasonable to infer that the Named Inventors, IIT, and/or other representatives of the Named Inventors and/or IIT withheld *Py-Paraffin* during prosecution of the '248 application (which eventually issued as the '944 patent) with the specific intent to deceive the PTO.

**Infectious Unenforceability**

89. Alternatively, or in addition, the '944 patent is unenforceable under the doctrine of infectious unenforceability due to the acts, failures to act, omissions, and deceptive intent of the Named Inventors, IIT, and/or and the attorneys who represented IIT and/or the Named Inventors during prosecution of the '474 patent, because the '474 patent claims priority to the '944 patent. At a minimum, to the extent that Plaintiffs asserts that the '474 patent is related to and/or entitled to the priority filing date of the '944 patent, any inequitable conduct that renders the '474 patent unenforceable also renders the '944 patent unenforceable via infectious unenforceability and/or unclean hands.

90. There is an immediate and necessary relation between the inequitable conduct used to procure the '474 patent, detailed herein, and All Cell's enforcement of the '944 patent, for the following reasons: (i) the '474 patent claims priority (as a continuation-in-part) to the '944 patent; (ii) All Cell asserts, in this litigation, that the '474 patent is entitled to priority to the filing date of the '944 patent; (iii) the '944 patent and '474 patent have identical titles ("Battery System Thermal Management"); (iv) the specification of the '944 patent is incorporated by reference into the '474 patent; and (v) the claims of the '944 patent have significant overlap with the claims of the '474 patent.

91. Despite the added disclosures contained in the ’474 patent relative to the ’944 patent, there is significant overlap between the claim terms of the ’944 patent and the ’474 patent. For example, a comparison of claim 1 of the ’944 patent and claim 11 of the ’474 patent is shown below, with similar elements emphasized:

| ’944 patent | ’474 patent |
|---|---|
| 1. A battery module comprising: | 11. A thermally managed lithium-based battery system, the system comprising: |
| a housing; | |
| **a plurality of electrochemical cell elements** contained within the housing, the electrical cell elements capable of a heat-generating charge; | **an electrochemical cell array comprising a plurality of lithium-based electrochemical cell elements** and |
| | a thermal management matrix at least in part in thermal contact with at least one of the lithium-based electrochemical cell elements of the electrochemical cell array, |
| **a supply of a phase change material** also contained within the housing and in thermal contact with at least one of the plurality of electrochemical cell elements whereby the phase change material absorbs at least a portion of the heat generated upon a charge or discharge of electric power from the at least one of the plurality of electrochemical cell elements, the phase change material having a thermal conductivity; and | thermal management matrix comprising **a supply of phase change material**, |
| **a heat-conductive containment lattice member** also contained within the housing, the containment lattice member having a plurality of openings **wherein at least a portion of the supply of the phase change material is disposed**. | **at least a portion of the supply of phase change material disposed in a heat conductive lattice member.** |

92. Counterclaim-Plaintiff Workhorse seeks a declaratory judgment that the ’944 patent is unenforceable.

**COUNT VIII**
**DECLARATORY JUDGMENT OF UNENFORCEABILITY OF U.S. PATENT NO. 8,273,474**

93. Counterclaim-Plaintiff Workhorse incorporates and realleges the allegations set forth in the foregoing Counterclaim Paragraphs, above, as if set forth fully herein.

94. The ’474 patent is unenforceable because the Named Inventors, IIT, and the attorneys who represented IIT and/or the Named Inventors, when involved in the prosecution of the ’474 patent, along with the entire family of related patents and patent applications, deliberately withheld one or more known material prior art references from the PTO during prosecution of the ’474 patent. The single most reasonable inference that a reasonable factfinder can draw from each of these acts is that the deliberate withholding of these material references was done or made with the specific intent to deceive the PTO.

95. During prosecution of the ’474 patent, as well as during prosecution of the entire family of patents and patent applications related to the ’474 patent, including the ’944 patent, the Named Inventors, IIT, and their attorneys and agents and anyone else responsible for prosecuting the ’474 and ’944 patents (and related patents and applications), knew or should have known that all patent applicants and their counsel are under a duty to act with good faith and candor before the PTO and are required by 37 C.F.R. § 1.56 to disclose material information to the PTO.

96. The attorneys and agents who prosecuted and prosecute the ’474 and ’944 patents on behalf of the Named Inventors and/or IIT, including but not limited to Nick Kottis (“Mr. Kottis”) of Pauley Petersen Kinne & Erickson, are registered patent attorneys who knew

or should have known of their duty of good faith and candor before the PTO and the requirement of 37 C.F.R. § 1.56 to disclose material information to the PTO.

**Inequitable Conduct for Failure to Disclose the *Py - Paraffin* Reference**

97. Again, because it is relevant to the below-described inequitable conduct, at least claim 1 of the ‘474 patent is not entitled to any priority date before the filing date of the ’188 provisional application, ***May 7, 2007***, and the ‘474 patent issued on ***September 25, 2012***.

98. The Named Inventors and IIT had knowledge of *Py – Paraffin* while the ’800 application was pending in the USPTO and before the ’474 patent issued.

99. *Py – Paraffin* was not included in the ’474 IDS.

100. *Py – Paraffin* discloses, *inter alia*, “[a] new supported phase change material (PCM) made of paraffin impregnated by capillary forces in a compressed natural graphite (CENG) material.” *Py – Paraffin* at Abstract. *Py* **-** *Paraffin* further discloses that “[e]xpanded graphite powders were poured into a cubic mold of aluminum and then pressed to obtain the porous graphite matrix with the desired bulk density. . . . Each cubic matrix was soaked into melted paraffin and regularly weighted until maximum load was reached.” *Py – Paraffin* at 2729. Accordingly, the disclosure of *Py – Paraffin* includes the exact elements that the Examiner concluded was absent from the prior art when allowing the ’944 patent, namely, “a heat-conductive lattice member having a plurality of openings wherein at least a portion of the supply of the phase change material is disposed,” which elements are also claimed in the ’474 patent claims.

101. The only element included in claim 11 of the ’474 patent that is not included in the claims of the ’944 patent is “a thermal management matrix at least in part in thermal contact with at least one of the lithium-based electrochemical cell elements of the electrochemical cell array”. The claims of the ’474 patent further require that thermal management matrix comprises

a supply of phase change material, at least a portion of the supply of phase change material disposed in a heat conductive lattice member. *Py – Paraffin* discloses a thermal management matrix comprising a supply of phase change material disposed at least in part in a heat conductive lattice member, as claimed in the ’474 patent. Accordingly, *Py – Paraffin* would have been material to the Examiner during examination of the ’248 application, which eventually issued as the ’944 patent.

102. It is reasonable to conclude that the Named Inventors and IIT, having knowledge of *Py – Paraffin* and knowing that *Py – Paraffin* discloses the exact claim elements that the Examiner of the ’474 patent had previously expressed (in prosecution of the ’944 patent) to be absent in the prior art, made a deliberate decision to withhold *Py – Paraffin* from the Examiner in order to obtain issuance of the ’474 patent and the claims.

103. Based on at least the following facts, *Py – Paraffin* was but-for material to the ’474 patent: (i) the ’474 patent claims, *inter alia*, “[a] thermal management matrix comprising a supply of phase change material disposed at least in part in a heat conductive lattice member”; (ii) the ’474 patent specifically identifies graphite as a material for the lattice member and paraffin as a phase change material; (iii) *Py – Paraffin* discloses a “porous graphite matrix” that is “soaked into melted paraffin”; and (iv) based on the Statement of Reasons for Allowance for the ’944 patent— there was no such statement for the ’474 patent—the Examiner believed the claimed thermal management matrix to be absent from the prior art.

104. Based on at least the Named Inventors’ and IIT’s statement in *Thermal Conductivity* that that *Py – Paraffin* discloses “impregnating a porous graphite matrix with PCM”, the Named Inventors and IIT knew that *Py – Paraffin* was material to patentability.

105. It is reasonable to infer that the Named Inventors, IIT, and/or other representatives of the Named Inventors and/or IIT withheld *Py-Paraffin* during prosecution of the '248 application (which eventually issued as the '944 patent) with the specific intent to deceive the PTO.

106. The Named Inventors, IIT, Mr. Kottis, and/or other representatives of the Named Inventors and/or IIT withheld *Py – Paraffin* during prosecution of the '800 application (which eventually issued as the '474 patent) with the specific intent to deceive the PTO.

**<u>Inequitable Conduct for Failure to Disclose the *Thermal Management* Reference</u>**

107. The Named Inventors are co-authors, along with Siddique A. Khateeb, Shabab Amiruddin, and Mohammed Farid, of Khateeb et al., *Thermal management of Li-ion battery with phase change material for electric scooters: experimental validation*, 142 Journal of Power Sources 345-353 (2005) ("*Thermal Management*").

108. *Thermal Management* identifies the Named Inventors, as well as Siddique A. Khateeb and Shabab Amiruddin, as being affiliated with IIT.

109. *Thermal Management* was published no later than 2005, more than one year before the May 7, 2008, filing date of the '800 application (which eventually issued as the '474 patent), and more than one year before the May 7, 2007, filing date of the '188 provisional application.

110. *Thermal Management* is prior art to the '474 patent under 35 U.S.C. § 102(b).

111. *Thermal Management* includes authors that are not named inventors on the face of the '474 patent.

112. *Thermal Management* is "by another" relative to the '474 patent for the purposes of 35 U.S.C. § 102(a).

113. *Thermal Management* is prior art to the '474 patent under 35 U.S.C. § 102(a).

114. *Thermal Management* states that "[t]his work reports the laboratory test results of a Li-ion battery designed for electric scooter applications. Four different modes of heat dissipation were investigated in this experimental study: (1) natural convection cooling; (2) presence of aluminum foam heat transfer matrix; (3) use of phase change material (PCM); and (4) combination of aluminum foam and PCM." *Thermal Management* at Abstract. *Thermal Management* further states that "[t]wo battery packs were assembled for independent testing of the thermal management; one using phase change material alone and the other with PCM distributed in the pores of aluminum foam." *Thermal Management* at 346. Accordingly, the disclosure of *Thermal Management* includes the exact elements that the Examiner concluded was absent from the prior art when allowing the '944 patent, namely, "a heat-conductive lattice member having a plurality of openings wherein at least a portion of the supply of the phase change material is disposed," which elements are also claimed in the '474 patent claims.

115. Based on at least the following facts, *Thermal Management* was but-for material to the '474 patent: (i) the '474 patent claims, *inter alia*, "[a] thermal management matrix comprising a supply of phase change material disposed at least in part in a heat conductive lattice member"; (ii) the '474 patent specifically identifies aluminum foam as a material for the lattice member; (iii) *Thermal Management* discloses an "aluminum foam heat transfer matrix" in combination with a phase change material; and (iv) based on the Statement of Reasons for Allowance for the '944 patent—there was no such statement for the '474 patent—the Examiner believed the claimed thermal management matrix to be absent from the prior art.

116. *Thermal Management* was not included in the '474 IDS or otherwise disclosed to the PTO during the pendency of the '800 application (which eventually issued as the '474 patent).

117. It is reasonable to conclude that the Named Inventors and IIT, having knowledge of *Thermal Management* and having personally participated in writing *Thermal Management*, which discloses the exact claim elements that the Examiner of the '474 patent had previously expressed (in prosecution of the '944 patent) to be absent in the prior art, made a deliberate decision to withhold Thermal Management from the Examiner in order to obtain issuance of the '474 patent and the claims.

118. It is reasonable to infer that the Named Inventors, IIT, Mr. Kottis, and/or other representatives of the Named Inventors and/or IIT withheld *Thermal Management* during prosecution of the '800 application (which eventually issued as the '474 patent) with the specific intent to deceive the PTO

119. The Named Inventors, IIT, Mr. Kottis, and/or other representatives of the Named Inventors and/or IIT withheld *Thermal Management* during prosecution of the '800 application (which eventually issued as the '474 patent) with the specific intent to deceive the PTO.

**Inequitable Conduct for Failure to Disclose the *Passive Thermal* Reference**

120. The Named Inventors are co-authors, along with Riza Kizilel, Abdul Lateef, Rami Sabbah, and Mohammed Farid, of Al-Hallaj et al., *Passive Thermal Management Using Phase Change Material (PCM) for EV and HEV Li-ion Batteries*, Proceedings of the 2005 IEEE Vehicle Power and Propulsion Conference VPPC, 2005, pp. 376-380 ("*Passive Thermal*").

121. *Passive Thermal* identifies the Named Inventors, as well as Riza Kizilel, Abdul Lateef, and Rami Sabbah, as being affiliated with IIT.

122. *Passive Thermal* was published no later than 2005, more than one year before the May 7, 2008, filing date of the '800 application (which eventually issued as the '474 patent), and more than one year before the May 7, 2007, filing date of the '188 provisional application.

123. *Passive Thermal* is prior art to the ’474 patent under 35 U.S.C. § 102(b).

124. *Passive Thermal* includes authors that are not named inventors on the face of the ’474 patent.

125. *Passive Thermal* is “by another” relative to the ’474 patent for the purposes of 35 U.S.C. § 102(a).

126. *Passive Thermal* is prior art to the ’474 patent under 35 U.S.C. § 102(a).

127. *Passive Thermal* states, *inter alia*, “[t]he graphite matrix filled with commercial PCM was prepared with Li-ion cells connected in series and parallel configuration to meet the voltage and current requirement of the module.” *Passive Thermal* at 377. *Passive Thermal* further states that “[t]he rate of heat removal is improved by impregnating the PCM in a graphite matrix which provides higher thermal conductivity.” *Passive Thermal* at 377. Still further, *Passive Thermal* states that “[t]he high thermal conductivity of graphite used to contain the PCM allowed high rate of heat removal and minimized nonuniform temperature distribution in the battery pack.” *Passive Thermal* at 377-78. Accordingly, the disclosure of *Passive Thermal* includes the exact elements that the Examiner concluded was absent from the prior art when allowing the ’944 patent, namely, “a heat-conductive lattice member having a plurality of openings wherein at least a portion of the supply of the phase change material is disposed,” which elements are also claimed in the ’474 patent claims.

128. Based on at least the following facts, *Passive Thermal* was but-for material to the ’474 patent: (i) the ’474 patent claims, *inter alia*, “[a] thermal management matrix comprising a supply of phase change material disposed at least in part in a heat conductive lattice member”; (ii) the ’474 patent specifically identifies graphite as a material for the lattice member; (iii) *Passive Thermal* discloses a “graphite matrix filled with commercial PCM . . . prepared with Li-

ion cells"; and (iv) based on the Statement of Reasons for Allowance for the '944 patent—there was no such statement for the '474 patent—the Examiner believed the claimed thermal management matrix to be absent from the prior art.

129. *Passive Thermal* was not included in the '474 IDS or otherwise disclosed to the PTO during the pendency of the '800 application (which eventually issued as the '474 patent).

130. It is reasonable to conclude that the Named Inventors and IIT, having knowledge of *Passive Thermal* and having personally participated in writing *Passive Thermal*, which includes the exact claim elements that the Examiner of the '474 patent had previously expressed (in prosecution of the '944 patent) to be absent in the prior art, made a deliberate decision to withhold *Passive Thermal* from the Examiner in order to obtain issuance of the '474 patent and the claims.

131. It is reasonable to infer that the Named Inventors, IIT, Mr. Kottis, and/or other representatives of the Named Inventors and/or IIT withheld *Passive Thermal* during prosecution of the '800 application (which eventually issued as the '474 patent) with the specific intent to deceive the PTO

132. The Named Inventors, IIT, Mr. Kottis, and/or other representatives of the Named Inventors and/or IIT withheld *Passive Thermal* during prosecution of the '800 application (which eventually issued as the '474 patent) with the specific intent to deceive the PTO.

**Infectious Unenforceability**

133. Alternatively, or in addition, the '474 patent is unenforceable under the doctrine of infectious unenforceability due to the acts, failures to act, omissions, and deceptive intent of the Named Inventors, IIT, and/or and the attorneys who represented IIT and/or the Named Inventors during prosecution of the '474 patent and/or the '944 patent, because the '474 patent claims priority to the '944 patent. At a minimum, to the extent that Plaintiffs asserts that the

’474 patent is related to and/or entitled to the priority filing date of the ’944 patent, any inequitable conduct that renders the ’944 patent unenforceable also renders the ’474 patent unenforceable via infectious unenforceability and/or unclean hands.

134. Despite the added disclosures contained in the ’474 patent relative to the ’944 patent, there is significant overlap between the claim terms of the ’944 patent and the ’474 patent. A comparison of claim 1 of the ’944 patent and claim 11 of the ’474 patent is below, with similar elements emphasized:

| **’944 patent** | **’474 patent** |
|---|---|
| 1. A battery module comprising: | 11. A thermally managed lithium-based battery system, the system comprising: |
| a housing; | |
| <u>**a plurality of electrochemical cell elements**</u> contained within the housing, the electrical cell elements capable of a heat-generating charge; | <u>**an electrochemical cell array comprising a plurality of lithium-based electrochemical cell elements**</u> and |
| | a thermal management matrix at least in part in thermal contact with at least one of the lithium-based electrochemical cell elements of the electrochemical cell array, |
| **a supply of a phase change material** also contained within the housing and in thermal contact with at least one of the plurality of electrochemical cell elements whereby the phase change material absorbs at least a portion of the heat generated upon a charge or discharge of electric power from the at least one of the plurality of electrochemical cell elements, the phase change material having a thermal conductivity; and | thermal management matrix comprising <u>**a supply of phase change material**</u>, |

| | |
|---|---|
| **a heat-conductive containment lattice member** also contained within the housing, the containment lattice member having a plurality of openings **wherein at least a portion of the supply of the phase change material is disposed**. | **at least a portion of the supply of phase change material disposed in a heat conductive lattice member**. |

136. Counterclaim-Plaintiff Workhorse seeks a declaratory judgment that the ’474 patent is unenforceable.

**COUNT IX**
**DECLARATORY JUDGMENT OF UNENFORCEABILITY OF U.S. PATENT NO. 6,468,689**

137. Counterclaim-Plaintiff Workhorse incorporates and realleges the allegations set forth in the foregoing Counterclaim Paragraphs, above, as if set forth fully herein.

138. An intentional concealment of prior art that is material to the patentability of the inventions claimed in a patent, an affirmative misrepresentation of a material fact, the submission of false material information, and/or the failure to disclose material information, coupled with an intent to deceive the PTO, constitutes inequitable conduct before the PTO.

139. The ’689 patent is unenforceable under the doctrine of infectious unenforceability due to the acts, failures to act, omissions, and deceptive intent of Named Inventors, IIT, and/or and the attorneys who represented IIT and/or the Named Inventors during prosecution of the ’944 patent and/or the ’474 patent, set forth in Counterclaim paragraphs 25–136, above, because the ’474 patent and the ’944 patent claim priority to the ’689 patent. At a minimum, to the extent that Plaintiffs asserts that the ’474 patent or the ’944 patent is related to and/or entitled to the priority filing date of the ’689 patent, any inequitable conduct that renders the ’944 patent or ’474 patent unenforceable also renders the ’689 patent unenforceable via infectious unenforceability and/or unclean hands.

140. There is an immediate and necessary relation between the inequitable conduct used to procure the ’944 and ’474 patents, detailed herein, and All Cell’s enforcement of the ’689 patent, for the following reasons: (i) the ’474 and ’944 patents claim priority (as continuations-in-part) to the ’689 patent; (ii) the title of the ’689 patent (“Thermal Management of Battery Systems”) is nearly identical to the title of the ’944 patent and ’474 patents (“Battery System Thermal Management”); (iv) the specification of the ’689 patent is incorporated by reference into both the ’944 patent and the ’474 patent; and (v) the claims of the ’944 patent and ’474 patent have significant overlap with the claims of the ’689 patent.

141. Despite the new matter in the ’944 patent, there is significant overlap between the claim terms of the ’689 patent and the ’944 patent. A comparison of claim 1 of the ’689 patent with claim 21 of the ’944 patent is below, with significant common elements emphasized:

| **’689 patent** | **’944 patent** |
| --- | --- |
| 1. **A method of operating a power supply system, the method comprising**: | 21. **A method of operating a power supply system, the method comprising**: |
| **discharging at least one cell element of a battery module to produce a quantity of power and a quantity of heat,** | **discharging at least one cell element of a battery module to produce a quantity of power and a quantity of heat,** |
| **absorbing at least a portion of the quantity of heat in a phase change material in thermal contact with the discharging cell element** | **absorbing at least a portion of the quantity of heat in a phase change material in thermal contact with the discharging cell element**<br>with the phase change material disposed in a plurality of openings in a heat-conductive containment lattice member, |
| **following discharge, releasing at least a portion of the absorbed quantity of heat from the phase change material to heat the at least one cell element,** and | **following discharge, releasing at least a portion of the absorbed quantity of heat from the phase change material to heat the at least one cell element** to a greater than ambient temperature, and |

| | |
|---|---|
| **<u>discharging the at least one cell element</u>** at elevated temperature. | subsequently **<u>discharging the heated at least one cell element</u>**. |

142. Despite the new matter in the ’474 patent, there is significant overlap between the claim terms of the ’689 patent and the ’474 patent. For example, claim 1 of the ’689 patent recites multiple steps for removing heat from a cell element with a phase change material and releasing that heat back from the phase change material to the cell element: “discharging at least one cell element of a battery module to produce a quantity of power and a quantity of heat”; “absorbing at least a portion of the quantity of heat in a phase change material in thermal contact with the discharging cell element”; and “releasing at least a portion of the absorbed quantity of heat from the phase change material to heat the at least one cell element.” Claim 17 of the ’474 recites a similar process, but in a single step, of dissipating heat from a first cell element to a second cell element via a phase change material: “dissipating heat produced by at least a first electrochemical cell element of the electrochemical cell array at least in part via . . . a supply of phase change material . . . , the heat being dissipated to . . . the second electrochemical cell element.”

143. Counterclaim-Plaintiff Workhorse seeks a declaratory judgment that the ’689 patent is unenforceable.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Workhorse respectfully requests the following relief:

A. Dismissal of Plaintiffs’ Complaint with prejudice, granting Workhorse’s Affirmative Defenses and Counterclaims, and denying each request for relief made by Plaintiffs;

B. Entry of judgment in Workhorse’s favor on each and every count of Plaintiffs’ Complaint;

C. Entry of an Order directing that Workhorse is not liable to Plaintiffs for any damages pursuant to Plaintiffs' Complaint;

D. Entry of judicial declarations in favor of Workhorse under Counts I through XI of Counterclaim-Plaintiff Workhorse's Counterclaims that:

1. No claim of any of the Patents-in-Suit is infringed by Workhorse;
2. The claims of all of the Patents-in-Suit patent are invalid; and
3. The Patents-in-Suit are unenforceable;

E. An award to Workhorse of compensatory damages, attorneys' fees and costs, and interest on its Affirmative Defenses and Counterclaims;

F. Entry of an Order that Workhorse is the prevailing party, that this is an exceptional case under 35 U.S.C. § 285 because Plaintiffs brought this action with wrongful intent, or at least gross negligence, and with knowledge that Workhorse's accused products do not and cannot infringe any valid claim of the Patents-in-Suit; with knowledge that the claims of the Patents-in-Suit are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112; and/or based on any other facts and circumstances warranting a finding of an exceptional case in favor of Workhorse;

G. An award to Workhorse of its reasonable attorney fees and costs pursuant to 35 U.S.C. § 285; and

H. Such other and further relief and this Court deems just and proper.

Respectfully submitted,

Dated: October 28, 2019

/s/ *R. Eric Gaum*
R. Eric Gaum (0066573)
TAFT STETTINIUS & HOLLISTER LLP
200 Public Square, Suite 3500
Cleveland, Ohio 44114
Phone: (216) 241-2838
Fax: (216) 241-3707
E-mail: egaum@taftlaw.com

Jonathan G. Polak
Ryan O. White
Patrick J. Palascak
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204
Phone: (317) 713-3500
Fax: (317) 713-3699
Email: jpolak@taftlaw.com
rwhite@taftlaw.com
ppalascak@taftlaw.com

Jaimin H. Shah
TAFT STETTINIUS & HOLLISTER LLP
111 East Upper Wacker Drive, Suite 2800
Chicago, IL 60601
Phone: (312) 836-4171
Fax: (317) 966-8607
Email: Jshah@taftlaw.Com

*Attorneys for Defendants Workhorse Motor Works Inc. and Workhorse Group Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies and states that, on October 28, 2019, a true and accurate copy of the foregoing **DEFENDANTS WORKHORSE MOTOR WORKS INC.'S AND WORKHORSE GROUP INC.'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS** was caused to be filed with the Court's electronic filing system at the Office of the Clerk, United States District Court for the Southern District of Indiana, and served on all counsel of record for Plaintiff via the Court's electronic filing system and email.

Matthew G. McAndrews
Kyle D. Wallenberg
NIRO McANDREWS, LLP
155 North Wacker Drive, Suite 4250
Chicago, Illinois 60606
(312) 755-8575
Fax: (312) 674-7481
mmcandrews@niro-mcandrews.com
kwallenberg@niro-mcandrews.com

*Attorneys for Plaintiffs*