**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| ALL CELL TECHNOLOGIES, LLC and ILLINOIS INSTITUTE OF TECHNOLOGY,<br><br>Plaintiff,<br><br>v.<br><br>WORKHORSE MOTOR WORKS INC. and WORKHORSE GROUP INC.<br><br>Defendants. | Civil Action No. 1:19-cv-2975<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFFS/COUNTERCLAIM-DEFENDANTS' ANSWER TO DEFENDANTS/COUNTERCLAIM-PLAINTIFFS' COUNTERCLAIMS

Plaintiffs/Counterclaim-Defendants All Cell Technologies, LLC and Illinois Institute of Technology (collectively, "AllCell" or "Plaintiffs") answer the Counterclaims of Defendants/Counterclaim-Plaintiffs Workhorse Motor Works Inc. and Workhorse Group Inc. (collectively, "Workhorse" or "Defendants") as follows:

## DEFENDANTS WORKHORSE MOTOR WORKS INC.'S AND WORKHORSE GROUP INC.'S COUNTERCLAIMS

For [their] Counterclaims against All Cell Technologies, LLC ("All Cell") and Illinois Institute of Technology ("IIT") (collectively, "Plaintiffs"), Counterclaim-Plaintiffs Workhorse Motor Works Inc. and Workhorse Group Inc. (collectively[,] "Workhorse") by their undersigned counsel, allege as follows:

## THE PARTIES

1. Counterclaim-Plaintiff Workhorse Motor Works Inc. ("WMW") is a corporation organized under the laws of the State of Indiana with a manufacturing plant located at 940 Indiana State Road 32, Union City, Indiana 47390.

**Answer:**

Admitted.

2. Counterclaim-Plaintiff Workhorse Group Inc. ("WGI") is a publicly traded corporation organized under the laws of the State of Nevada.

**Answer:**

Admitted.

3. On information and belief, Counterclaim-Defendant All Cell Technologies, LLC ("All Cell") is a limited liability company organized under the laws of the State of Illinois with a place of business at 2321 West 41st Street, Chicago, Illinois 60609.

**Answer:**

Admitted.

4. On information and belief, Counterclaim Defendant Illinois Institute of Technology ("IIT"), is a corporation organized under the laws of the State of Illinois with a place of business at 10 West 35[th] Street, Chicago, Illinois 60616.

**Answer:**

Admitted.

## JURISDICTION

5. Counterclaim-Plaintiff Workhorse's Counterclaims are for declarations of non-infringement, invalidity, and/or unenforceability of U.S. Patent Nos. 6,468,689 ("'689 patent"); 6,942,944 ("'944 patent"); and 8,273,474 ("'474 patent") (collectively, the "Patents-in-Suit"). Accordingly, this Court has subject matter jurisdiction over the Counterclaim-Plaintiff's Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202, as well as the Patent Act, 35 U.S.C. § 1, *et seq.*

**Answer:**

Admitted.

6. Plaintiffs/Counterclaim-Defendants have submitted themselves to this Court's jurisdiction by alleging, in the present lawsuit, that Workhorse infringes the Patents-in-Suit. Accordingly, an actual case or controversy between Counterclaim-Plaintiff Workhorse and Plaintiffs/Counterclaim-Defendants exists and is of such immediacy and reality to warrant the issuance of a declaratory judgment.

**Answer:**

Admitted, except denied that the instant case or controversy warrants the issuance of any declaratory judgment Counterclaim-Plaintiff Workhorse seeks herein.

**COUNT I**
**DECLARATORY JUDGMENT OF NON-INFRINGEMENT**
**OF U.S. PATENT NO. 6,468,689**

7. Counterclaim-Plaintiff Workhorse incorporates and realleges the allegations set forth in Counterclaim Paragraphs 1-6, above, as if set forth fully herein.

**Answer:**

Plaintiffs/Counterclaim-Defendants incorporate by reference their responses to the allegations in paragraph 1-6 of these Counterclaims, above, as if set forth fully herein.

8. Counterclaim-Plaintiff Workhorse does not infringe and has not infringed, directly or indirectly, literally or pursuant to the doctrine of equivalents, any claim of U.S. Patent No. 6,468,689.

**Answer:**

Denied.

9. Counterclaim-Plaintiff Workhorse seeks a declaratory judgment that it has not and does not infringe any claim of the '689 patent.

**Answer:**

Admitted that Counterclaim-Plaintiff Workhorse seeks the declaratory relief set forth in numbered paragraph 9 above. Denied that Counterclaim-Plaintiff Workhorse is entitled to such relief.

**COUNT II**
**DECLARATORY JUDGMENT OF INVALIDITY**
**OF U.S. PATENT NO. 6,468,689**

10. Counterclaim-Plaintiff Workhorse incorporates and realleges the allegations set forth in the foregoing Counterclaim Paragraphs, above, as if set forth fully herein.

**Answer:**

Plaintiffs/Counterclaim-Defendants incorporate by reference their responses to the allegations set forth in the foregoing Counterclaim Paragraphs, above, as if set forth fully herein.

11. The claims of the ‘689 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

**Answer:**

Denied.

12. For example, the asserted method claims 1-6 and 8 of the ’689 patent are directed to a law of nature, *i.e.* the natural law of heat exchange or heat flow between a battery cell and a phase change material. Furthermore, the claims apply the natural law using the following routine, conventional, well-understood activity: (1) the combination of a phase change material and a battery; (2) operation of a battery; (3) a heat-conductive lattice member; and (4) certain dependent claim features. The routine, conventional activity does not transform a patent-ineligible law of nature into a patent-eligible application of the natural law.

**Answer:**

Denied.

13. Further, the claims of the ’689 patent are rendered invalid as obvious by prior art. For example, U.S. Patent No. 4,329,407 to Gross et al. (“Gross”) discloses that electrochemical storage batteries operate at elevated temperatures such that during charging and discharging undesired temperature increases occur frequently which are caused by the internal electric resistance of such batteries. (Gross, 5:10-16). Gross also discloses that the interspace inside the cylinder surface of the storage cell is filled with a heat storage medium consisting, for instance, of fire clay material or salt mixtures such that the fire clay, oil, a salt or salt mixture when in the range of operating temperature of the storage cell is subject to a phase change such as melting or solidification. (Gross, 3:5-11). Next, U.S. Patent No. 4,883,726 to Peled et al. (“Peled”) discloses that a heat transfer material inserted into the free space between the cells in the battery pack and the heat absorption material (such as paraffin, wax, tar, or the like) is solid up to a predetermined temperature. (Peled, 1:28:38). Further, U.K. Patent Pub. No. GB2289976 to Bourne (“Bourne”) discloses a battery in which the circulation of heat transfer through cooling elements transfers heat from overheated elements to those that are at a lower temperature thereby maximizing the heat absorbing potential of the phase change material. (Bourne, Page 7, ll.8-12). In addition, Gross discloses that the removed heat is not lost but is used during pauses in operation for keeping the storage battery hot. (Gross, 3:1-10). Further, Peled discloses a multi-cell battery comprising a housing and a plurality of electrochemical cells of cylindrical cross section positioned in the housing with an electrically insulating substance provided in the space between the cells that is a solid having a melting point and capable of taking up heat and transferring heat from one cell to

the others. (Peled, claim 1). Gross discloses that the operating temperature of the battery of the sodium and sulfur type is for instance about 300C and during charging and discharging the undesired temperature increases occur frequently which are caused by internal electric resistance of such batteries. (Gross, 5:10-16). Both Gross and Peled disclose that a supply of phase change material is contained within the housing and in thermal contact with the electrochemical cell elements as claimed in the ’689 patent.

**Answer:**

Denied.

14. Counterclaim-Plaintiff Workhorse seeks a declaratory judgment that the claims of the ‘689 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

**Answer:**

Admitted that Counterclaim-Plaintiff Workhorse seeks the declaratory relief set forth in numbered paragraph 14 above. Denied that Counterclaim-Plaintiff Workhorse is entitled to such relief.

## COUNT III
## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 6,942,944

15. Counterclaim-Plaintiff Workhorse incorporates and realleges the allegations set forth in Counterclaim Paragraphs 1-12, above, as if set forth fully herein.

**Answer:**

Plaintiffs/Counterclaim-Defendants incorporate by reference their responses to the allegations set forth in the foregoing Counterclaim Paragraphs, above, as if set forth fully herein.

16. Counterclaim-Plaintiff Workhorse does not infringe and has not infringed, directly or indirectly, literally or pursuant to the doctrine of equivalents, any claim of U.S. Patent No. 6,942,944.

**Answer:**

Denied.

17. Counterclaim-Plaintiff Workhorse seeks a declaratory judgment that it has not and does not infringe any claim of the ‘944 patent.

**Answer:**

Admitted that Counterclaim-Plaintiff Workhorse seeks the declaratory relief set forth in numbered paragraph 17 above. Denied that Counterclaim-Plaintiff Workhorse is entitled to such relief.

**COUNT IV**
**DECLARATORY JUDGMENT OF INVALIDITY**
**OF U.S. PATENT NO. 6,942,944**

18. Counterclaim-Plaintiff Workhorse incorporates and realleges the allegations set forth in the foregoing Counterclaim Paragraphs, above, as if set forth fully herein.

**Answer:**

Plaintiffs/Counterclaim-Defendants incorporate by reference their responses to the allegations set forth in the foregoing Counterclaim Paragraphs, above, as if set forth fully herein.

19. The claims of the ‘944 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

**Answer:**

Denied.

20. For example, the asserted method claims 21-23 and 26 of ’944 patent are directed to a law of nature, i.e. the natural law of heat exchange or heat flow between a battery cell and a phase change material. Furthermore, the Asserted Method Claims apply the natural law using the following routine, conventional, well-understood activity: (1) the combination of a phase change material and a battery; (2) operation of a battery; (3) a heat-conductive lattice member; and (4) certain dependent claim features. The routine, conventional activity does not transform a patent-ineligible law of nature into a patent-eligible application of the natural law.

**Answer:**

Denied.

21. Further, the claims of the ’944 patent are rendered invalid as obvious by prior art. For example, U.S. Patent No. 4,022,952 to Fritts (“Fritts”) discloses that the heat sink material impregnating the porous matrix is a thermal phase-change material with a high heat of fusion and melts at a temperature slightly lower than the battery limiting material. (Fritts, 2:48-59). Fritts

also discloses that the space is filled with a reticulated or a wire or a honeycomb such that a network of porous metal whose interstices are filled with a heat absorbent material. (Fritts, 2:19-24). Fritts further discloses that the heat sink material impregnating the porous matrix preferably should be a thermal phase-change material with a high heat of fusion and melt at a temperature slightly lower than the battery limiting temperature. (Fritts, 2:48-59). Moreover, Bourne and Gross disclose following discharge, a portion of the absorbed quantity of heat from the phase change material is discharged to heat the at least one cell element. "A Novel Thermal Management System" (manuscript submitted to IEEE on January 10, 2000) to Hallaj et al. ("Hallaj") discloses that the heat stored in the PCM enables the cell temperature to remain higher than the surrounding temperature during relaxation thereby the effective capacity during a subsequent charge or discharge is higher. (Hallaj, Page 3235, col. 1).

**Answer:**

Denied.

22. Counterclaim-Plaintiff Workhorse seeks a declaratory judgment that the claims of the '944 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

**Answer:**

Admitted that Counterclaim-Plaintiff Workhorse seeks the declaratory relief set forth in numbered paragraph 22 above. Denied that Counterclaim-Plaintiff Workhorse is entitled to such relief.

## COUNT V
## DECLARATORY JUDGMENT OF NON-INFRINGEMENT
## OF U.S. PATENT NO. 8,273,474

23. Counterclaim-Plaintiff Workhorse incorporates and realleges the allegations set forth in Counterclaim Paragraphs 1-18, above, as if set forth fully herein.

**Answer:**

Plaintiffs/Counterclaim-Defendants incorporate by reference their responses to the allegations set forth in the foregoing Counterclaim Paragraphs, above, as if set forth fully herein.

24. Counterclaim-Plaintiff Workhorse does not infringe and has not infringed, directly or indirectly, literally or pursuant to the doctrine of equivalents, any claim of U.S. Patent No. 8,273,474.

**Answer:**

Denied.

25. Counterclaim-Plaintiff Workhorse seeks a declaratory judgment that it has not and does not infringe any claim of the ‘474 patent.

**Answer:**

Admitted that Counterclaim-Plaintiff Workhorse seeks the declaratory relief set forth in numbered paragraph 25 above. Denied that Counterclaim-Plaintiff Workhorse is entitled to such relief.

**COUNT VI**
**DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 8,273,474**

26. Counterclaim-Plaintiff Workhorse incorporates and realleges the allegations set forth in the foregoing Counterclaim Paragraphs, above, as if set forth fully herein.

**Answer:**

Plaintiffs/Counterclaim-Defendants incorporate by reference their responses to the allegations set forth in the foregoing Counterclaim Paragraphs, above, as if set forth fully herein.

27. The claims of the ‘474 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

**Answer:**

Denied.

28. For example, the asserted method claim 17 of the ’474 patent are directed to a law of nature, i.e. the natural law of heat exchange or heat flow between a battery cell and a phase change material. Furthermore, the Asserted Method Claims apply the natural law using the following routine, conventional, well-understood activity: (1) the combination of a phase change material and a battery; (2) operation of a battery; (3) a heat-conductive lattice member; and (4) certain dependent claim features. The routine, conventional activity does not transform a patent-ineligible law of nature into a patent-eligible application of the natural law.

**Answer:**

Denied.

29. Further, the claims of the ’474 patent are rendered invalid as obvious by prior art. For example, Peled and Gross disclose a battery system comprising an electrochemical cell array with a plurality of electrochemical cell elements. U.S. Patent No. 7,270,910 to Yahnker et al. (“Yahnker”) discloses utilizing micro phase-change crystals to form a highly efficient heat sink and the heat sink is formed from a heat conductive material such as aluminum, copper, or carbon fiber with micro-phase change crystals dispersed throughout the matrix. (Yahnker, 12:32-41). Yahnker further discloses that as the battery cell gives off heat, the heat is transferred to the gel tube and once the gel tube reaches the melt temperature of the wax, the phase change begins and as the wax melts the wax will absorb the heat. (Yahnker, 11:13-19). In addition, Peled discloses a multi-cell battery comprising a housing, a plurality of electrochemical cells of cylindrical cross section positioned in the housing with the cells having lithium. (Peled, Claim 1). As noted above, Yahnker and Peled disclose a thermal management matrix at least in part in thermal contact with at least one of the lithium-based electrochemical cell elements of the electrochemical cell array. As noted above with regard to Yahnker and as the same as the ’944 patent claims, Yahnker and Fritts disclose at least a portion of the supply of phase change material disposed in a heat conductive lattice member. Further, Peled discloses that a heat transfer material is inserted into the free space between the cells in the battery pack and the heat absorption material melts and transfers the released heat to all cells in the battery thereby increasing the available heat capacity and thermal runaway conditions are avoided. (Peled, 1:28-40). As noted above, Yahnker discloses dissipating heat produced by at least a first electrochemical cell element of the electrochemical cell array via a thermal management matrix at least in part enveloping at least the first and electrochemical cell elements of the electrochemical cell array. As noted above, Yahnker and Fritts disclose the thermal management matrix comprises a supply of phase change material at least in part disposed in a heat conductive lattice member. Gross discloses that the removed heat is not lost but is used during pauses in operation for keeping the storage battery hot. (Gross, 3:1-10).

**Answer:**

Denied.

30. Counterclaim-Plaintiff Workhorse seeks a declaratory judgment that the claims of the ‘474 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

**Answer:**

Admitted that Counterclaim-Plaintiff Workhorse seeks the declaratory relief set forth in numbered paragraph 30 above. Denied that Counterclaim-Plaintiff Workhorse is entitled to such relief.

**COUNT VII**
**DECLARATORY JUDGMENT OF UNENFORCEABILITY**
**OF U.S. PATENT NO. 6,942,944**

31. Counterclaim-Plaintiff Workhorse incorporates and realleges the allegations set forth in the foregoing Counterclaim Paragraphs, above, as if set forth fully herein.

**Answer:**

Plaintiffs/Counterclaim-Defendants incorporate by reference their responses to the allegations set forth in the foregoing Counterclaim Paragraphs, above, as if set forth fully herein.

32. The ‘944 patent is one of several related United States patent applications and issued patents in the chain of claimed priority that is shown in the table below in application filing date-order.

| App. No. | Filing Date | Issued Patent | Issue Date | Priority Claim |
|---|---|---|---|---|
| 09/515,268 ("'268 application") | Feb. 29, 2000 | **'689 patent** | Oct. 22, 2002 | None |
| 10/274,248 ("'248 application") | Oct. 18, 2002 | **'944 patent** | Sept. 13, 2005 | Continuation-in-part of '268 application |
| 11/255,823 ("'823 application") | Sept. 13, 2005 | NA (Abandoned) | NA | Continuation of '248 application, which is a continuation-in-part of '268 application |
| 60/928,188 ("'188 provisional application") | May 7, 2007 | NA (Expired) | NA | None |

| | | | | |
|---|---|---|---|---|
| 12/116,800<br>("'800 application") | May 7, 2008 | **'474 patent** | Sept. 25, 2012 | Continuation-in-part of '823 application, which is a continuation of '248 application, which is a continuation-in-part of '268 application; claims benefit of priority to '188 provisional application |

**Answer:**

Admitted that the table above accurately reflects the chain of claimed priority for the patent applications and issued patents shown in the table.

33. In addition to priority claims, the applications in the chain of claimed priority of the '944 patent share similar titles, and each issued patent incorporates each previous application in the chain of claimed priority by reference, as shown in the table below:

| App. No. | Title | Issued Patent | Incorporation by Reference |
|---|---|---|---|
| '268 application | Thermal Management of Battery Systems | **'689 patent** | None |
| '248 application | Battery System Thermal Management | **'944 patent** | Incorporates '268 application by reference |
| '823 application | Battery System Thermal Management | NA (Abandoned) | Incorporates '268 application by reference |
| '188 provisional application | Passive (PCM) Thermal Management of Li-Ion Batteries | NA (Expired) | Numerous publications and patents cited and included, including the '689 patent, the '944 patent, and the '823 application |
| '800 application | Battery System Thermal Management | **'474 patent** | Incorporates '188 provisional application, '823 application, '248 application, and '268 application by reference |

**Answer:**

Admitted that the table above accurately reflects the titles of, and chain of claimed priority for, the patent applications and issued patents shown in the table.

34. **[28]** **[*Counterclaim-Plaintiff Workhorse appears to have inadvertently restarted the numbering of its numbered counterclaim paragraphs with numbered paragraph 28 following numbered paragraph 33. Further, Counterclaim-Plaintiff Workhorse appears to have inadvertently numbered certain of its numbered counterclaim paragraphs out of sequence (e.g., the numbered counterclaim paragraphs progress from No. 30 to No. 32 at ECF No. 23, PageID ##: 183-184). Thus, for the sake of clarity and completeness, Plaintiffs/Counterclaim-Defendants will continue their answers using the correct, sequential paragraph numbers they believe Counterclaim-Plaintiff Workhorse to have intended to use, and include the inadvertently mistaken paragraph numbers in bracketed bold text.*]** The claims and specification of the '689 patent are generally directed to a battery system including one or more battery cells and a phase change material used to remove heat from, and return heat to, the battery cells.

**Answer:**

Admitted as to what the claims and specification of the '689 patent are "generally directed to." To the extent the averment of numbered paragraph 34 **[28]** above calls for a legal conclusion the answer to which depends on the district court's forthcoming construction of the claims of the Patents-in-Suit, a response is premature at this time and/or not required, and, therefore, the same is denied.

35. **[29]** The '944 patent, a continuation-in-part of the '689 patent, added disclosure directed to a heat-conductive lattice member in which the phase change material is disposed, and similarly added claim elements directed to the lattice member.

**Answer:**

Admitted that the '944 patent is a continuation-in-part of the '689 patent. Denied that the specification or any claim elements of the '944 patent disclose or refer to a "heat-conductive lattice member." The '944 patent specification and claim elements do reference and recite a "heat-conductive *containment* lattice member" (emphasis added). Further, to the extent the averment of numbered paragraph 35 **[29]** above calls for a legal conclusion the answer to which depends on

the district court's forthcoming construction of the claims of the Patents-in-Suit, a response is premature at this time and/or not required, and, therefore, the same is denied.

36. **[30]** The '474 patent, a continuation-in-part of a continuation of the '944 patent, added further disclosure directed to a thermal management matrix, and similarly added claim elements directed to the matrix. The '944 patent is unenforceable because Said Al-Hallaj and Jan Robert Selman (the "Named Inventors"), IIT, and the attorneys who represented IIT and/or the Named Inventors, when involved in the prosecution of the '944 patent, along with the entire family of related patents and patent applications, deliberately withheld one or more known material prior art references from the Patent and Trademark Office (the "PTO") during prosecution of the '944 patent. The single most reasonable inference that a reasonable factfinder can draw from each of these acts is that the deliberate withholding of these material references was done or made with the specific intent to deceive the PTO.

**Answer:**

Admitted that the '474 patent is a continuation-in-part of a continuation of the '944 patent. Admitted that the specification and claim elements of the '474 patent disclose and refer to a "thermal management matrix." The '944 patent specification and claim elements do reference and recite a "heat-conductive *containment* lattice member" (emphasis added). To the extent the averment of numbered paragraph 36 **[30]** above calls for a legal conclusion the answer to which depends on the district court's forthcoming construction of the claims of the Patents-in-Suit, a response is premature at this time and/or not required, and, therefore, the same is denied.

37. **[32]** During prosecution of the '944 patent, as well as during prosecution of the entire family of patents and patent applications related to the '944 patent, including the '474 patent, the Named Inventors, IIT, and their attorneys and agents, and anyone else responsible for prosecuting the '474 and '944 patents (and related patents and applications), knew or should have known that all patent applicants and their counsel are under a duty to act with good faith and candor before the PTO and are required by 37 C.F.R. § 1.56 to disclose material information to the PTO.

**Answer:**

Admitted.

38. **[33]** The attorneys and agents who prosecuted and prosecute the '474 and '944 patents on behalf of the Named Inventors and/or IIT, including but not limited to Nick Kottis ("Mr. Kottis") of Pauley Petersen Kinne & Erickson, are registered patent attorneys who knew or should

have known of their duty of good faith and candor before the PTO and the requirement of 37 C.F.R. § 1.56 to disclose material information to the PTO.

**Answer:**

Admitted.

## Prosecution and Content of the '944 Patent

39. **[34]** On October 18, 2002, Mr. Kottis filed the '248 application, entitled "Battery System Thermal Management Cross Reference to Related Application."

**Answer:**

Admitted.

40. **[35]** On October 18, 2002, Mr. Kottis also filed a Preliminary Amendment that amended the title of the '248 application to "Battery System Thermal Management."

**Answer:**

Admitted.

41. **[36]** On October 18, 2002, Mr. Kottis recorded an assignment of the '248 application from the Named Inventors to IIT with the PTO.

**Answer:**

Admitted.

42. **[37]** The '248 application eventually issued as the '944 patent.

**Answer:**

Admitted.

43. **[38]** The '944 patent lists, on its face, the Named Inventors as the inventors of the '944 patent.

**Answer:**

Admitted.

44. **[39]** On October 12, 2002, during prosecution of the '248 application—which eventually issued as the '944 patent—Mr. Kottis filed with the PTO a declaration that was signed by both of the Named Inventors, in which the Named Inventors acknowledged their duty to

disclose information of which they were aware that is material to patentability, including "information that is material to examination of this application which occurred between the filing date of said earlier pending application(s) relied upon under 35 U.S.C. 120 and the filing date of this application."

**Answer:**

Admitted that the Named Inventors signed the declaration to which numbered paragraph 44 **[39]** above refers on October 12, 2002, but believe, based on a review of the prosecution history of the '944 patent, that Mr. Kottis filed such declaration with the PTO on October 18, 2002.

45. **[40]** The '248 application identifies itself as a continuation-in-part of the '268 application. The '268 application eventually issued as the '689 patent.

**Answer:**

Admitted.

46. **[41]** FIGS. 10-13 of the '248 application, and of the '944 patent, are not included in the '268 application and constitute new matter included in the '268 application and the '689 patent.

**Answer:**

Admitted that FIGS 10-13 of the '248 application, and of the '944 patent, are not included in the '268 application. Denied that FIGS. 10-13 of the '248 application, and of the '944 patent, constitute new matter included in the '268 application and the '689 patent.

47. **[42]** The text appearing at 3:19-48, 4:6-17, and 7:34-14:26 of the '944 patent is not included in the '268 application and constitutes new matter included in the '268 application and the '689 patent.

**Answer:**

Admitted that the text appearing at 3:19-48, 4:6-17, and 7:34-14:26 of the '944 patent is not included in the '268 application. Denied that such text constitutes new matter included in the '268 application and the '689 patent.

48. **[43]** Claim 1 of the '944 patent recites, *inter alia*, "a heat-conductive lattice containment member also contained within the housing, the containment lattice member having a

plurality of openings wherein at least a portion of the supply of the phase change material is disposed."

**Answer:**

Admitted.

49. **[44]** The '268 application and the '689 patent do not include sufficient disclosure of "a heat-conductive lattice containment member also contained within the housing, the containment lattice member having a plurality of openings wherein at least a portion of the supply of the phase change material is disposed" to comply with the requirements of 35 U.S.C. § 112. Accordingly, at least claim 1 of the '944 patent is not entitled to any priority date before the filing date of the '248 application, October 18, 2002.

**Answer:**

Denied.

50. **[45]** Claim 5 of the '944 patent recites, *inter alia*, "wherein the containment lattice member comprises graphite."

**Answer:**

Admitted.

51. **[46]** The '944 patent states that "suitable such phase change materials may generally include paraffin waxes such as are relatively inexpensive, not easily or prone to decomposition and which generally have a relatively low melting temperature within the recommended range of operation for Li-ion cells." ('944 patent at 5:25-28.)

**Answer:**

Admitted.

52. **[47]** On October 18, 2002, Mr. Kottis submitted a First Information Disclosure Statement in the '248 application (which eventually issued as the '944 patent) on behalf of the Named Inventors and/or IIT ("First '944 IDS").

**Answer:**

Admitted.

53. **[48]** On November 12, 2004, Mr. Kottis submitted a Second Information Disclosure Statement in the '248 application (which eventually issued as the '944 patent) on behalf of the Named Inventors and/or IIT ("Second '944 IDS"). No further Information Disclosure Statements were filed by Mr. Kottis, the Named Inventors, and/or IIT in the '248 application.

**Answer:**

Admitted.

54. **[49]** On March 15, 2015, the Examiner issued a Notice of Allowance for the '248 application (which eventually issued as the '944 patent). In the Notice of Allowance, the Examiner stated that "[t]he prior art does not teach the invention, as claimed, including a heat-conductive lattice member having a plurality of openings wherein at least a portion of the supply of the phase change material is disposed contained within the housing."

**Answer:**

Admitted.

55. **[50]** The '944 patent issued on September 13, 2005.

**Answer:**

Admitted.

56. **[51]** The claims of the '944 patent have significant overlap with the claims of the '689 patent. Both the '689 patent and the '944 patent include an independent claim to a "method of operating a power supply system." Claim 1 of the '689 patent is compared to claim 21 of the '944 patent below, with similar claim elements emphasized.

| '689 patent | '944 patent |
|---|---|
| 1. **A method of operating a power supply system, the method comprising:** | 21. **A method of operating a power supply system, the method comprising:** |
| **discharging at least one cell element of a battery module to produce a quantity of power and a quantity of heat,** | **discharging at least one cell element of a battery module to produce a quantity of power and a quantity of heat,** |
| **absorbing at least a portion of the quantity of heat in a phase change material in thermal contact with the discharging cell element,** | **absorbing at least a portion of the quantity of heat in a phase change material in thermal contact with the discharging cell element** |
| | with the phase change material disposed in a plurality of openings in a heat-conductive containment lattice member, |

| | |
|---|---|
| **<u>following discharge, releasing at least a portion of the absorbed quantity of heat from the phase change material to heat the at least one cell element</u>**, and | **<u>following discharge, releasing at least a portion of the absorbed quantity of heat from the phase change material to heat the at least one cell element</u>** to a greater than ambient temperature, and |
| **<u>discharging the at least one cell element</u>** at elevated temperature. | subsequently **<u>discharging the</u>** heated **<u>at least one cell element</u>**. |

**<u>Answer:</u>**

Admitted that both the '689 patent and the '944 patent include an independent claim whose preamble recites a "method of operating a power supply system" and that claim 1 of the '689 patent is compared to claim 21 of the '944 patent, with similar claim elements emphasized, in the table Counterclaim-Plaintiff Workhorse sets forth in numbered paragraph 55 **[51]** above. Plaintiffs/Counterclaim-Defendants object to Counterclaim-Plaintiff Workhorse's undefined, subjective characterization of "significant overlap" between the claims of the '944 and '689 patents, and, therefore, deny the same.

57. **[52]** The '944 patent claims a "phase change material disposed in a plurality of openings in a heat-conductive containment lattice member." The '689 patent does not claim a heat-conductive lattice member having a plurality of openings in which a phase change material is disposed.

**<u>Answer:</u>**

Denied that the '944 patent *claims*, verbatim, a "phase change material disposed in a plurality of openings in a heat-conductive containment lattice member." Admitted that the '944 patent *discloses* a "phase change material disposed in a plurality of openings in a heat-conductive containment lattice member." (*See* '944 Patent 3:42-43.) Admitted that the '689 patent does not *claim*, verbatim, a "heat-conductive lattice member having a plurality of openings in which a phase change material is disposed." Further, to the extent the averment of numbered paragraph 56 **[52]** above calls for a legal conclusion the answer to which depends on the district court's forthcoming

construction of the claims of the Patents-in-Suit, a response is premature at this time and/or not required, and, therefore, the same is denied.

**Prosecution and Content of the '474 Patent**

58. **[53]** On May 7, 2008, Mr. Kottis filed the '800 application, entitled "Battery System Thermal Management."

**Answer:**

Admitted.

59. **[54]** On August 28, 2008, Mr. Kottis recorded an assignment of the '800 application from the Named Inventors to the Illinois Institute of Technology with the PTO.

**Answer:**

Admitted.

60. **[55]** The '800 application eventually issued as the '474 patent.

**Answer:**

Admitted.

61. **[56]** The '474 patent lists, on its face, the Named Inventors as the inventors of the '474 patent.

**Answer:**

Admitted.

62. **[57]** The face of the '474 patent identifies the '474 patent as a continuation-in-part of the '823 application, now abandoned, and further identifies the '823 application as a continuation of the '248 application (which eventually issued as the '944 patent).

**Answer:**

Admitted.

63. **[58]** The '474 patent purports to claim priority to provisional application no. 60/928,188, filed on May 7, 2007 (defined above as the "'188 provisional application").

**Answer:**

Admitted.

64. **[59]** On August 28, 2008, Mr. Kottis submitted a declaration signed by the Named Inventors to the PTO in which the Named Inventors acknowledged their duty to disclose information of which they were aware that is material to patentability.

**Answer:**

Admitted.

65. **[60]** On August 28, 2008, Mr. Kottis submitted a First Information Disclosure Statement in the '800 application (which eventually issued as the '474 patent) on behalf of the Named Inventors and/or IIT ("'474 IDS"). No further Information Disclosure Statements were filed in the '800 application by Mr. Kottis, the Named Inventors, and/or IIT.

**Answer:**

Admitted.

66. **[61]** Figures 14-18 of the '800 application were not included in the '823 application and constitute new matter included in the '800 application and the '474 patent.

**Answer:**

Admitted.

67. **[62]** Figures 14-18 of the '800 application were not included in the '248 application and constitute new matter included in the '248 application and the '944 patent.

**Answer:**

Admitted that Figures 14-18 of the '800 were not included in the '248 application. Denied that Figures 14-18 of the '800 application constitute new matter included in the '248 application and the '944 patent.

68. **[63]** The text at column 16, line 41 through column 18, line 58 of the '474 patent was not included in the '823 application and constitutes new matter included in the '823 application and the '474 patent.

**Answer:**

Admitted that the text at column 16, line 41 through column 18, line 58 of the '474 patent

was not included in the ‘823 application. Denied that such text constitutes new matter included in the ‘823 application. Admitted that such text constitutes new matter included in the ‘474 patent.

69. **[64]** The text at column 16, line 41 through column 18, line 58 of the ‘474 patent was not included in the ‘248 application and constitutes new matter included in the ‘823 application and the ‘474 patent.

Admitted that the text at column 16, line 41 through column 18, line 58 of the ‘474 patent was not included in the ‘248 application. Admitted that such text constitutes new matter included in the ‘823 application and the ‘474 patent.

70. **[65]** Claim 1 of the ’474 patent recites, *inter alia*, “a thermal management matrix at least in part enveloping the electrochemical cell array and in thermal contact therewith, the thermal management matrix comprising a supply of phase change material disposed at least in part in a heat conductive lattice member.”

**Answer:**

Admitted.

71. **[66]** Neither the ‘823 application nor the ‘248 application (which eventually issued as the ‘944 patent) includes sufficient disclosure of “a thermal management matrix at least in part enveloping the electrochemical cell array and in thermal contact therewith, the thermal management matrix comprising a supply of phase change material disposed at least in part in a heat conductive lattice member” to comply with the requirements of 35 U.S.C. § 112. Accordingly, at least claim 1 of the ‘474 patent is not entitled to a priority date any earlier than the filing date of the ‘188 provisional application, May 7, 2007.

**Answer:**

Denied.

72. **[67]** The ‘474 patent states that “[p]articular preferred containment lattice member materials for use in the practice of the invention include, for example, . . . aluminum foam.” (‘474 patent at 10:65-11:1.)

**Answer:**

Admitted.

73. **[68]** The ‘474 patent issued on September 25, 2012.

**Answer:**

Admitted.

**Inequitable Conduct for Failure to Disclose the *Py – Paraffin* Reference**

74. **[69]** Again, because it is relevant to the below-described inequitable conduct, at least claim 1 of the '944 patent is not entitled to any priority date before the filing date of the '248 application, ***October 18, 2002***, and the '944 patent issued on ***September 13, 2005.***

**Answer:**

Denied.

75. **[70]** One of the Named Inventors, Said Al-Hallaj, is a co-author, along with Andrew Mills, of Mills et al., *Simulation of passive thermal management system for lithium-ion battery packs*, 141 Journal of Power Sources 307-315 (2005) ("*Mills - Simulation*").

**Answer:**

Admitted.

76. **[71]** *Mills – Simulation* was submitted by its authors to the Journal of Power Sources no later than September 14, 2004, while the '248 application was pending in the PTO, and before the '944 patent issued on September 13, 2005.

**Answer:**

Admitted.

77. **[72]** *Mills – Simulation* identifies its authors, Andrew Mills and Said Al-Hallaj, as being affiliated with IIT.

**Answer:**

Admitted.

78. **[73]** *Mills – Simulation* includes a note 6 which lists Py et al., *Paraffin/porous-graphite- matrix composite and a high and constant power thermal storage material*, 44 Int'l Journal of Heat and Mass Transfer 2727-2737 (2001) ("*Py - Paraffin*"). Accordingly, Said Al-Hallaj, a Named Inventor, and IIT (the assignee of the '248 application), had knowledge of *Py - Paraffin* while the '248 application was pending in the PTO and before the '944 patent issued.

**Answer:**

Admitted.

79. **[74]** *Py – Paraffin* discloses, *inter alia*, "[a] new supported phase change material (PCM) made of paraffin impregnated by capillary forces in a compressed natural graphite (CENG) material." *Py – Paraffin* at Abstract. *Py - Paraffin* further discloses that "[e]xpanded graphite powders were poured into a cubic mold of aluminum and then pressed to obtain the porous graphite matrix with the desired bulk density . . . . Each cubic matrix was soaked into melted paraffin and regularly weighted until maximum load was reached." *Py – Paraffin* at 2729. Accordingly, the disclosure of *Py – Paraffin* includes the exact elements that the Examiner concluded was absent from the prior art when allowing the '944 patent, namely, "a heat-conductive lattice member having a plurality of openings wherein at least a portion of the supply of the phase change material is disposed." Accordingly, *Py – Paraffin* would have been material to the Examiner during examination of the '248 application, which eventually issued as the '944 patent.

**Answer:**

Denied that the abstract of *Py – Paraffin* discloses, *inter alia*, "[a] new supported phase change material (PCM) made of paraffin impregnated by capillary forces in a compressed natural graphite (CENG) *material*." (Emphasis added.) Admitted that *Py - Paraffin* discloses that "[e]xpanded graphite powders were poured into a cubic mold of aluminum and then pressed to obtain the porous graphite matrix with the desired bulk density . . . . Each cubic matrix was soaked into melted paraffin and regularly weighted until maximum load was reached." *Py – Paraffin* at 2729. Denied as to remaining averments of numbered paragraph 78 **[74]** above.

80. **[75]** *Py – Paraffin* published no later than August 2001—more than a year before the filing date of the '248 application (which eventually issued as the '944 patent), October 18, 2002.

**Answer:**

Plaintiffs lack sufficient information from which to form a belief as to the truth of the averments contained in numbered paragraph 79 **[75]** above and therefore deny the same.

81. **[76]** *Py – Paraffin* is prior art to the '944 patent under 35 U.S.C. § 102(b).

**Answer:**

Plaintiffs lack sufficient information from which to form a belief as to the truth of the

averments contained in numbered paragraph 80 **[76]** above and therefore deny the same.

82. **[77]** *Py – Paraffin* includes authors that are not named inventors on the face of the '474 patent.

**Answer:**

Admitted.

83. **[78]** *Py – Paraffin* is "by another" relative to the '944 patent for the purposes of 35 U.S.C. § 102(a).

**Answer:**

Plaintiffs lack sufficient information from which to form a belief as to the truth of the averments contained in numbered paragraph 82 **[78]** above and therefore deny the same.

84. **[79]** *Py – Paraffin* is prior art to the '944 patent under 35 U.S.C. § 102(a).

**Answer:**

Plaintiffs lack sufficient information from which to form a belief as to the truth of the averments contained in numbered paragraph 83 **[79]** above and therefore deny the same.

85. **[80]** The Named Inventors are co-authors, along with Andrew Mills and Mohammed Farid, of Mills et al., *Thermal conductivity enhancement of phase change materials using a graphite matrix*, 26 Applied Thermal Engineering 1652-61 (2006) ("*Thermal Conductivity*").

**Answer:**

Admitted.

86. **[81]** *Thermal Conductivity* identifies the Named Inventors and Andrew Mills as being affiliated with IIT.

**Answer:**

Admitted.

87. **[82]** *Thermal Conductivity* states that "[v]arious methods have been investigated for increasing the thermal conductivity of PCMs. The methods include . . . impregnating a porous graphite matrix with PCM [3,6-8]." *Thermal Conductivity* at 1652. Note 6 in *Thermal Conductivity* refers to *Py – Paraffin*. Accordingly, the Named Inventors and IIT, through the

Named Inventors and Andrew Mills, have explicitly stated that *Py – Paraffin* discloses "impregnating a porous graphite matrix with PCM."

**Answer:**

Denied.

88. **[83]** The Named Inventors, and IIT (the assignee of the '248 application), understood *Py – Paraffin* to disclose a heat-conductive lattice member having a plurality of openings wherein at least a portion of the supply of the phase change material is disposed before the issuance of the '944 patent. Accordingly, the Named Inventors and IIT knew that *Py – Paraffin* would have been material to the Examiner during examination of the '944 patent.

**Answer:**

Denied.

89. **[84]** Based on at least the Named Inventors' and IIT's statement in *Thermal Conductivity* that that *Py – Paraffin* discloses "impregnating a porous graphite matrix with PCM," the Named Inventors and IIT knew that *Py – Paraffin* was material to patentability.

**Answer:**

Denied.

90. **[85]** *Py – Paraffin* was not included in the First '944 IDS or the Second '944 IDS or otherwise disclosed to the PTO during the pendency of the '248 application (which eventually issued as the '944 patent).

**Answer:**

Admitted.

91. **[86]** It is reasonable to conclude that the Named Inventors and IIT, having knowledge of *Py – Paraffin* and knowing that *Py – Paraffin* discloses the exact claim elements that the Examiner of the '944 patent believed to be absent in the prior art, made a deliberate decision to withhold *Py – Paraffin* from the Examiner in order to obtain issuance of the '944 patent and the claims.

**Answer:**

Denied.

92. **[87]** Based on at least the following three facts, *Py – Paraffin* was but-for material to the '944 patent: (i) the Examiner stated, when allowing the '248 application that "[t]he prior art does not teach the invention, as claimed, including a heat-conductive lattice member having a

plurality of openings wherein at least a portion of the supply of the phase change material is disposed"; (ii) the '944 patent specifically identifies graphite as a material for the lattice member and paraffin as a phase change material; and (iii) *Py – Paraffin* discloses a "porous graphite matrix" that is "soaked into melted paraffin."

**Answer:**

Denied.

93. **[88]** It is reasonable to infer that the Named Inventors, IIT, and/or other representatives of the Named Inventors and/or IIT withheld *Py-Paraffin* during prosecution of the '248 application (which eventually issued as the '944 patent) with the specific intent to deceive the PTO.

**Answer:**

Denied.

**Infectious Unenforceability**

94. **[89]** Alternatively, or in addition, the '944 patent is unenforceable under the doctrine of infectious unenforceability due to the acts, failures to act, omissions, and deceptive intent of the Named Inventors, IIT, and/or and the attorneys who represented IIT and/or the Named Inventors during prosecution of the '474 patent, because the '474 patent claims priority to the '944 patent. At a minimum, to the extent that Plaintiffs asserts that the '474 patent is related to and/or entitled to the priority filing date of the '944 patent, any inequitable conduct that renders the '474 patent unenforceable also renders the '944 patent unenforceable via infectious unenforceability and/or unclean hands.

**Answer:**

Denied.

95. **[90]** There is an immediate and necessary relation between the inequitable conduct used to procure the '474 patent, detailed herein, and All Cell's enforcement of the '944 patent, for the following reasons: (i) the '474 patent claims priority (as a continuation-in-part) to the '944 patent; (ii) All Cell asserts, in this litigation, that the '474 patent is entitled to priority to the filing date of the '944 patent; (iii) the '944 patent and '474 patent have identical titles ("Battery System Thermal Management"); (iv) the specification of the '944 patent is incorporated by reference into the '474 patent; and (v) the claims of the '944 patent have significant overlap with the claims of the '474 patent.

**Answer:**

Denied.

96. **[91]** Despite the added disclosures contained in the '474 patent relative to the '944 patent, there is significant overlap between the claim terms of the '944 patent and the '474 patent. For example, a comparison of claim 1 of the '944 patent and claim 11 of the '474 patent is shown below, with similar elements emphasized:

| **'944 patent** | **'474 patent** |
|---|---|
| 1. A battery module comprising: | 11. A thermally managed lithium-based battery system, the system comprising: |
| a housing; | |
| **a plurality of electrochemical cell elements** contained within the housing, the electrical cell elements capable of a heat-generating charge; | **an electrochemical cell array comprising a plurality of lithium-based electrochemical cell elements** and |
| | a thermal management matrix at least in part in thermal contact with at least one of the lithium-based electrochemical cell elements of the electrochemical cell array, |
| **a supply of a phase change material** also contained within the housing and in thermal contact with at least one of the plurality of electrochemical cell elements whereby the phase change material absorbs at least a portion of the heat generated upon a charge or discharge of electric power from the at least one of the plurality of electrochemical cell elements, the phase change material having a thermal conductivity; and | thermal management matrix comprising **a supply of phase change material**, |
| **a heat-conductive containment lattice member** also contained within the housing, the containment lattice member having a plurality of openings **wherein at least a portion of the supply of the phase change material is disposed**. | **at least a portion of the supply of phase change material disposed in a heat conductive lattice member**. |

**Answer:**

Admitted that claim 1 of the '944 patent is compared to claim 11 of the '474 patent, with similar claim elements emphasized, in the table Counterclaim-Plaintiff Workhorse sets forth in

numbered paragraph 95 **[91]** above. AllCell objects to Counterclaim-Plaintiff Workhorse's undefined, subjective characterization of "significant overlap" between the claims terms of the '944 and '474 patents, and, therefore, denies the same.

97. **[92]** Counterclaim-Plaintiff Workhorse seeks a declaratory judgment that the '944 patent is unenforceable.

**Answer:**

Admitted that Counterclaim-Plaintiff Workhorse seeks the declaratory relief set forth in numbered paragraph 96 **[92]** above. Denied that Counterclaim-Plaintiff Workhorse is entitled to such relief.

## COUNT VIII
## DECLARATORY JUDGMENT OF UNENFORCEABILITY
## OF U.S. PATENT NO. 8,273,474

98. **[93]** Counterclaim-Plaintiff Workhorse incorporates and realleges the allegations set forth in Counterclaim Paragraphs 1-96 **[92]**, above, as if set forth fully herein.

**Answer:**

AllCell incorporates by reference its responses to the allegations in paragraph 1-96 **[92]** of these Counterclaims, above, as if set forth fully herein.

99. **[94]** The '474 patent is unenforceable because the Named Inventors, IIT, and the attorneys who represented IIT and/or the Named Inventors, when involved in the prosecution of the '474 patent, along with the entire family of related patents and patent applications, deliberately withheld one or more known material prior art references from the PTO during prosecution of the '474 patent. The single most reasonable inference that a reasonable factfinder can draw from each of these acts is that the deliberate withholding of these material references was done or made with the specific intent to deceive the PTO.

**Answer:**

Denied.

100. **[95]** During prosecution of the '474 patent, as well as during prosecution of the entire family of patents and patent applications related to the '474 patent, including the '944 patent, the Named Inventors, IIT, and their attorneys and agents and anyone else responsible for prosecuting the '474 and '944 patents (and related patents and applications), knew or should have

known that all patent applicants and their counsel are under a duty to act with good faith and candor before the PTO and are required by 37 C.F.R. § 1.56 to disclose material information to the PTO.

**Answer:**

Admitted.

101. **[96]** The attorneys and agents who prosecuted and prosecute the '474 and '944 patents on behalf of the Named Inventors and/or IIT, including but not limited to Nick Kottis ("Mr. Kottis") of Pauley Petersen Kinne & Erickson, are registered patent attorneys who knew or should have known of their duty of good faith and candor before the PTO and the requirement of 37 C.F.R. § 1.56 to disclose material information to the PTO.

**Answer:**

Admitted.

**Inequitable Conduct for Failure to Disclose the *Py - Paraffin* Reference**

102. **[97]** Again, because it is relevant to the below-described inequitable conduct, at least claim 1 of the '474 patent is not entitled to any priority date before the filing date of the '188 provisional application, ***May 7, 2007***, and the '474 patent issued on ***September 25, 2012***.

**Answer:**

Denied.

103. **[98]** The Named Inventors and IIT had knowledge of *Py – Paraffin* while the '800 application was pending in the USPTO and before the '474 patent issued.

**Answer:**

Admitted.

104. **[99]** *Py – Paraffin* was not included in the '474 IDS.

**Answer:**

Admitted.

105. **[100]** *Py – Paraffin* discloses, *inter alia*, "[a] new supported phase change material (PCM) made of paraffin impregnated by capillary forces in a compressed natural graphite (CENG) material." *Py – Paraffin* at Abstract. *Py - Paraffin* further discloses that "[e]xpanded graphite powders were poured into a cubic mold of aluminum and then pressed to obtain the porous graphite matrix with the desired bulk density . . . . Each cubic matrix was soaked into melted paraffin and

regularly weighted until maximum load was reached." *Py – Paraffin* at 2729. Accordingly, the disclosure of *Py – Paraffin* includes the exact elements that the Examiner concluded was absent from the prior art when allowing the '944 patent, namely, "a heat-conductive lattice member having a plurality of openings wherein at least a portion of the supply of the phase change material is disposed," which elements are also claimed in the '474 patent claims.

**Answer:**

Denied that the abstract of *Py – Paraffin* discloses, *inter alia*, "[a] new supported phase change material (PCM) made of paraffin impregnated by capillary forces in a compressed natural graphite (CENG) *material*." (Emphasis added.) Admitted that *Py - Paraffin* discloses that "[e]xpanded graphite powders were poured into a cubic mold of aluminum and then pressed to obtain the porous graphite matrix with the desired bulk density . . . . Each cubic matrix was soaked into melted paraffin and regularly weighted until maximum load was reached." *Py – Paraffin* at 2729. Denied as to remaining averments of numbered paragraph 104 **[100]** above.

106. **[101]** The only element included in claim 11 of the '474 patent that is not included in the claims of the '944 patent is "a thermal management matrix at least in part in thermal contact with at least one of the lithium-based electrochemical cell elements of the electrochemical cell array". The claims of the '474 patent further require that thermal management matrix comprises a supply of phase change material, at least a portion of the supply of phase change material disposed in a heat conductive lattice member. *Py – Paraffin* discloses a thermal management matrix comprising a supply of phase change material disposed at least in part in a heat conductive lattice member, as claimed in the '474 patent. Accordingly, *Py – Paraffin* would have been material to the Examiner during examination of the '248 application, which eventually issued as the '944 patent.

**Answer:**

Admitted that the only element included in claim 11 of the '474 patent that is not included in the claims of the '944 patent is "a thermal management matrix at least in part in thermal contact with at least one of the lithium-based electrochemical cell elements of the electrochemical cell array." Denied as to remaining averments of numbered paragraph 105 **[101]** above.

107. **[102]** It is reasonable to conclude that the Named Inventors and IIT, having knowledge of *Py – Paraffin* and knowing that *Py – Paraffin* discloses the exact claim elements that the Examiner of the '474 patent had previously expressed (in prosecution of the '944 patent)

to be absent in the prior art, made a deliberate decision to withhold *Py – Paraffin* from the Examiner in order to obtain issuance of the '474 patent and the claims.

**Answer:**

Denied.

108. **[103]** Based on at least the following facts, *Py – Paraffin* was but-for material to the '474 patent: (i) the '474 patent claims, *inter alia*, "[a] thermal management matrix comprising a supply of phase change material disposed at least in part in a heat conductive lattice member"; (ii) the '474 patent specifically identifies graphite as a material for the lattice member and paraffin as a phase change material; (iii) *Py – Paraffin* discloses a "porous graphite matrix" that is "soaked into melted paraffin"; and (iv) based on the Statement of Reasons for Allowance for the '944 patent— there was no such statement for the '474 patent—the Examiner believed the claimed thermal management matrix to be absent from the prior art.

**Answer:**

Denied.

109. **[104]** Based on at least the Named Inventors' and IIT's statement in *Thermal Conductivity* that that *Py – Paraffin* discloses "impregnating a porous graphite matrix with PCM", the Named Inventors and IIT knew that *Py – Paraffin* was material to patentability.

**Answer:**

Denied.

110. **[105]** It is reasonable to infer that the Named Inventors, IIT, and/or other representatives of the Named Inventors and/or IIT withheld *Py-Paraffin* during prosecution of the '248 application (which eventually issued as the '944 patent) with the specific intent to deceive the PTO.

**Answer:**

Denied.

111. **[106]** The Named Inventors, IIT, Mr. Kottis, and/or other representatives of the Named Inventors and/or IIT withheld *Py – Paraffin* during prosecution of the '800 application (which eventually issued as the '474 patent) with the specific intent to deceive the PTO.

**Answer:**

Denied.

**<u>Inequitable Conduct for Failure to Disclose the *Thermal Management* Reference</u>**

112. **[107]** The Named Inventors are co-authors, along with Siddique A. Khateeb, Shabab Amiruddin, and Mohammed Farid, of Khateeb et al., *Thermal management of Li-ion battery with phase change material for electric scooters: experimental validation*, 142 Journal of Power Sources 345-353 (2005) ("*Thermal Management*").

**<u>Answer:</u>**

Admitted.

113. **[108]** *Thermal Management* identifies the Named Inventors, as well as Siddique A. Khateeb and Shabab Amiruddin, as being affiliated with IIT.

**<u>Answer:</u>**

Admitted.

114. **[109]** *Thermal Management* was published no later than 2005, more than one year before the May 7, 2008, filing date of the '800 application (which eventually issued as the '474 patent), and more than one year before the May 7, 2007, filing date of the '188 provisional application.

**<u>Answer:</u>**

Admitted.

115. **[110]** *Thermal Management* is prior art to the '474 patent under 35 U.S.C. § 102(b).

**<u>Answer:</u>**

Plaintiffs lack sufficient information from which to form a belief as to the truth of the averments contained in numbered paragraph 115 **[110]** above and therefore deny the same.

116. **[111]** *Thermal Management* includes authors that are not named inventors on the face of the '474 patent.

**<u>Answer:</u>**

Admitted.

117. **[112]** *Thermal Management* is "by another" relative to the '474 patent for the purposes of 35 U.S.C. § 102(a).

**Answer:**

Plaintiffs lack sufficient information from which to form a belief as to the truth of the averments contained in numbered paragraph 117 **[112]** above and therefore deny the same.

118. **[113]** *Thermal Management* is prior art to the '474 patent under 35 U.S.C. § 102(a).

**Answer:**

Plaintiffs lack sufficient information from which to form a belief as to the truth of the averments contained in numbered paragraph 118 **[113]** above and therefore deny the same.

119. **[114]** *Thermal Management* states that "[t]his work reports the laboratory test results of a Li-ion battery designed for electric scooter applications. Four different modes of heat dissipation were investigated in this experimental study: (1) natural convection cooling; (2) presence of aluminum foam heat transfer matrix; (3) use of phase change material (PCM); and (4) combination of aluminum foam and PCM." *Thermal Management* at Abstract. *Thermal Management* further states that "[t]wo battery packs were assembled for independent testing of the thermal management; one using phase change material alone and the other with PCM distributed in the pores of aluminum foam." *Thermal Management* at 346. Accordingly, the disclosure of *Thermal Management* includes the exact elements that the Examiner concluded was absent from the prior art when allowing the '944 patent, namely, "a heat-conductive lattice member having a plurality of openings wherein at least a portion of the supply of the phase change material is disposed," which elements are also claimed in the '474 patent claims.

**Answer:**

Admitted that the abstract of *Thermal Management* states that "[t]his work reports the laboratory test results of a Li-ion battery designed for electric scooter applications. Four different modes of heat dissipation were investigated in this experimental study: (1) natural convection cooling; (2) presence of aluminum foam heat transfer matrix; (3) use of phase change material (PCM); and (4) combination of aluminum foam and PCM." Admitted that *Thermal Management* further states that "[t]wo battery packs were assembled for independent testing of the thermal management; one using phase change material alone and the other with PCM distributed in the pores of aluminum foam." Denied as to remaining averments of numbered paragraph 119 **[114]**

above.

120. **[115]** Based on at least the following facts, *Thermal Management* was but-for material to the ‘474 patent: (i) the ‘474 patent claims, *inter alia*, “[a] thermal management matrix comprising a supply of phase change material disposed at least in part in a heat conductive lattice member”; (ii) the ‘474 patent specifically identifies aluminum foam as a material for the lattice member; (iii) *Thermal Management* discloses an “aluminum foam heat transfer matrix” in combination with a phase change material; and (iv) based on the Statement of Reasons for Allowance for the ‘944 patent—there was no such statement for the ‘474 patent—the Examiner believed the claimed thermal management matrix to be absent from the prior art.

**Answer:**

Denied.

121. **[116]** *Thermal Management* was not included in the ‘474 IDS or otherwise disclosed to the PTO during the pendency of the ‘800 application (which eventually issued as the ‘474 patent).

**Answer:**

Admitted.

122. **[117]** It is reasonable to conclude that the Named Inventors and IIT, having knowledge of *Thermal Management* and having personally participated in writing *Thermal Management*, which discloses the exact claim elements that the Examiner of the ‘474 patent had previously expressed (in prosecution of the ‘944 patent) to be absent in the prior art, made a deliberate decision to withhold *Thermal Management* from the Examiner in order to obtain issuance of the ’474 patent and the claims.

**Answer:**

Denied.

123. **[118]** It is reasonable to infer that the Named Inventors, IIT, Mr. Kottis, and/or other representatives of the Named Inventors and/or IIT withheld *Thermal Management* during prosecution of the ‘800 application (which eventually issued as the ‘474 patent) with the specific intent to deceive the PTO[.]

**Answer:**

Denied.

124. **[119]** The Named Inventors, IIT, Mr. Kottis, and/or other representatives of the Named Inventors and/or IIT withheld *Thermal Management* during prosecution of the ‘800

application (which eventually issued as the ‘474 patent) with the specific intent to deceive the PTO.

**Answer:**

Denied.

**Inequitable Conduct for Failure to Disclose the *Passive Thermal* Reference**

125. **[120]** The Named Inventors are co-authors, along with Riza Kizilel, Abdul Lateef, Rami Sabbah, and Mohammed Farid, of Al-Hallaj et al., *Passive Thermal Management Using Phase Change Material (PCM) for EV and HEV Li-ion Batteries*, Proceedings of the 2005 IEEE Vehicle Power and Propulsion Conference VPPC, 2005, pp. 376-380 (“*Passive Thermal*”).

**Answer:**

Admitted.

126. **[121]** *Passive Thermal* identifies the Named Inventors, as well as Riza Kizilel, Abdul Lateef, and Rami Sabbah, as being affiliated with IIT.

**Answer:**

Admitted.

127. **[122]** *Passive Thermal* was published no later than 2005, more than one year before the May 7, 2008, filing date of the ‘800 application (which eventually issued as the ‘474 patent), and more than one year before the May 7, 2007, filing date of the ‘188 provisional application.

**Answer:**

Admitted.

128. **[123]** *Passive Thermal* is prior art to the ‘474 patent under 35 U.S.C. § 102(b).

**Answer:**

Plaintiffs lack sufficient information from which to form a belief as to the truth of the averments contained in numbered paragraph 128 **[123]** above and therefore deny the same.

129. **[124]** *Passive Thermal* includes authors that are not named inventors on the face of the ‘474 patent.

**Answer:**

Admitted.

130. **[125]** *Passive Thermal* is "by another" relative to the '474 patent for the purposes of 35 U.S.C. § 102(a).

**Answer:**

Plaintiffs lack sufficient information from which to form a belief as to the truth of the averments contained in numbered paragraph 130 **[125]** above and therefore deny the same.

131. **[126]** *Passive Thermal* is prior art to the '474 patent under 35 U.S.C. § 102(a).

**Answer:**

Plaintiffs lack sufficient information from which to form a belief as to the truth of the averments contained in numbered paragraph 131 **[126]** above and therefore deny the same.

132. **[127]** *Passive Thermal* states, *inter alia*, "[t]he graphite matrix filled with commercial PCM was prepared with Li-ion cells connected in series and parallel configuration to meet the voltage and current requirement of the module." *Passive Thermal* at 377. *Passive Thermal* further states that "[t]he rate of heat removal is improved by impregnating the PCM in a graphite matrix which provides higher thermal conductivity." *Passive Thermal* at 377. Still further, *Passive Thermal* states that "[t]he high thermal conductivity of graphite used to contain the PCM allowed high rate of heat removal and minimized nonuniform temperature distribution in the battery pack." *Passive Thermal* at 377-78. Accordingly, the disclosure of *Passive Thermal* includes the exact elements that the Examiner concluded was absent from the prior art when allowing the '944 patent, namely, "a heat-conductive lattice member having a plurality of openings wherein at least a portion of the supply of the phase change material is disposed," which elements are also claimed in the '474 patent claims.

**Answer:**

Admitted that *Passive Thermal* states, *inter alia*: (1) "[t]he graphite matrix filled with commercial PCM was prepared with Li-ion cells connected in series and parallel configuration to meet the voltage and current requirement of the module"; (2) "[t]he rate of heat removal is improved by impregnating the PCM in a graphite matrix which provides higher thermal conductivity"; and (3) "[t]he high thermal conductivity of graphite used to contain the PCM allowed high rate of heat removal and minimized nonuniform temperature distribution in the battery

pack." Denied as to remaining averments of numbered paragraph 132 **[127]** above.

133. **[128]** Based on at least the following facts, *Passive Thermal* was but-for material to the '474 patent: (i) the '474 patent claims, *inter alia*, "[a] thermal management matrix comprising a supply of phase change material disposed at least in part in a heat conductive lattice member"; (ii) the '474 patent specifically identifies graphite as a material for the lattice member; (iii) *Passive Thermal* discloses a "graphite matrix filled with commercial PCM . . . prepared with Li-ion cells"; and (iv) based on the Statement of Reasons for Allowance for the '944 patent—there was no such statement for the '474 patent—the Examiner believed the claimed thermal management matrix to be absent from the prior art.

**Answer:**

Denied.

134. **[129]** *Passive Thermal* was not included in the '474 IDS or otherwise disclosed to the PTO during the pendency of the '800 application (which eventually issued as the '474 patent).

**Answer:**

Admitted.

135. **[130]** It is reasonable to conclude that the Named Inventors and IIT, having knowledge of *Passive Thermal* and having personally participated in writing *Passive Thermal*, which includes the exact claim elements that the Examiner of the '474 patent had previously expressed (in prosecution of the '944 patent) to be absent in the prior art, made a deliberate decision to withhold *Passive Thermal* from the Examiner in order to obtain issuance of the '474 patent and the claims.

**Answer:**

Denied.

136. **[131]** It is reasonable to infer that the Named Inventors, IIT, Mr. Kottis, and/or other representatives of the Named Inventors and/or IIT withheld *Passive Thermal* during prosecution of the '800 application (which eventually issued as the '474 patent) with the specific intent to deceive the PTO[.]

**Answer:**

Denied.

137. **[132]** The Named Inventors, IIT, Mr. Kottis, and/or other representatives of the Named Inventors and/or IIT withheld *Passive Thermal* during prosecution of the '800 application (which eventually issued as the '474 patent) with the specific intent to deceive the PTO.

**Answer:**

Denied.

**Infectious Unenforceability**

138. **[133]** Alternatively, or in addition, the ‘474 patent is unenforceable under the doctrine of infectious unenforceability due to the acts, failures to act, omissions, and deceptive intent of the Named Inventors, IIT, and/or and the attorneys who represented IIT and/or the Named Inventors during prosecution of the ‘474 patent and/or the ‘944 patent, because the ‘474 patent claims priority to the ‘944 patent. At a minimum, to the extent that Plaintiffs asserts that the ‘474 patent is related to and/or entitled to the priority filing date of the ‘944 patent, any inequitable conduct that renders the ‘944 patent unenforceable also renders the ‘474 patent unenforceable via infectious unenforceability and/or unclean hands.

**Answer:**

Denied.

139. **[134]** Despite the added disclosures contained in the ‘474 patent relative to the ‘944 patent, there is significant overlap between the claim terms of the ‘944 patent and the ‘474 patent. A comparison of claim 1 of the ‘944 patent and claim 11 of the ‘474 patent is below, with similar elements emphasized:

| ‘944 patent | ‘474 patent |
|---|---|
| 1. A battery module comprising: | 11. A thermally managed lithium-based battery system, the system comprising: |
| a housing; | |
| **a plurality of electrochemical cell elements** contained within the housing, the electrical cell elements capable of a heat-generating charge; | **an electrochemical cell array comprising a plurality of lithium-based electrochemical cell elements** and |
| | a thermal management matrix at least in part in thermal contact with at least one of the lithium-based electrochemical cell elements of the electrochemical cell array, |

| | |
|---|---|
| <u>**a supply of a phase change material**</u> also contained within the housing and in thermal contact with at least one of the plurality of electrochemical cell elements whereby the phase change material absorbs at least a portion of the heat generated upon a charge or discharge of electric power from the at least one of the plurality of electrochemical cell elements, the phase change material having a thermal conductivity; and | thermal management matrix comprising <u>**a supply of phase change material**</u>, |
| <u>**a heat-conductive containment lattice member**</u> also contained within the housing, the containment lattice member having a plurality of openings <u>**wherein at least a portion of the supply of the phase change material is disposed**</u>. | <u>**at least a portion of the supply of phase change material disposed in a heat conductive lattice member**</u>. |

<u>**Answer:**</u>

Admitted that claim 1 of the ‘944 patent is compared to claim 11 of the ‘474 patent, with similar claim elements emphasized, in the table Counterclaim-Plaintiff Workhorse sets forth in numbered paragraph 139 **[134]** above. AllCell objects to Counterclaim-Plaintiff Workhorse’s undefined, subjective characterization of “significant overlap” between the claims terms of the ‘944 and ‘474 patents, and, therefore, denies the same.

140. **[136]** Counterclaim-Plaintiff Workhorse seeks a declaratory judgment that the ‘474 patent is unenforceable.

<u>**Answer:**</u>

Admitted that Counterclaim-Plaintiff Workhorse seeks the declaratory relief set forth in numbered paragraph 140 **[136]** above. Denied that Counterclaim-Plaintiff Workhorse is entitled to such relief.

**COUNT IX**
**DECLARATORY JUDGMENT OF UNENFORCEABILITY**
<u>**OF U.S. PATENT NO. 6,468,689**</u>

141. **[137]** Counterclaim-Plaintiff Workhorse incorporates and realleges the allegations

set forth in the foregoing Counterclaim Paragraphs, above, as if set forth fully herein.

**Answer:**

Plaintiffs/Counterclaim-Defendants incorporate by reference their responses to the allegations set forth in the foregoing Counterclaim Paragraphs, above, as if set forth fully herein.

142. **[138]** An intentional concealment of prior art that is material to the patentability of the inventions claimed in a patent, an affirmative misrepresentation of a material fact, the submission of false material information, and/or the failure to disclose material information, coupled with an intent to deceive the PTO, constitutes inequitable conduct before the PTO.

**Answer:**

Admitted only that the averments set forth in numbered paragraph 142 **[138]** above recite the general legal principles that apply with respect to an inequitable conduct analysis.

143. **[139]** The '689 patent is unenforceable under the doctrine of infectious unenforceability due to the acts, failures to act, omissions, and deceptive intent of Named Inventors, IIT, and/or and the attorneys who represented IIT and/or the Named Inventors during prosecution of the '944 patent and/or the '474 patent, set forth in Counterclaim paragraphs 25–136 [sic], above, because the '474 patent and the '944 patent claim priority to the '689 patent. At a minimum, to the extent that Plaintiffs asserts that the '474 patent or the '944 patent is related to and/or entitled to the priority filing date of the '689 patent, any inequitable conduct that renders the '944 patent or '474 patent unenforceable also renders the '689 patent unenforceable via infectious unenforceability and/or unclean hands.

**Answer:**

Denied.

144. **[140]** There is an immediate and necessary relation between the inequitable conduct used to procure the '944 and '474 patents, detailed herein, and All Cell's enforcement of the '689 patent, for the following reasons: (i) the '474 and '944 patents claim priority (as continuations-in-part) to the '689 patent; (ii) the title of the '689 patent ("Thermal Management of Battery Systems") is nearly identical to the title of the '944 patent and '474 patents ("Battery System Thermal Management"); (iv) the specification of the '689 patent is incorporated by reference into both the '944 patent and the '474 patent; and (v) the claims of the '944 patent and '474 patent have significant overlap with the claims of the '689 patent.

**Answer:**

Denied.

145. **[141]** Despite the new matter in the '944 patent, there is significant overlap between the claim terms of the '689 patent and the '944 patent. A comparison of claim 1 of the '689 patent with claim 21 of the '944 patent is below, with significant common elements emphasized:

| **'689 patent** | **'944 patent** |
|---|---|
| 1. **A method of operating a power supply system, the method comprising**: | 21. **A method of operating a power supply system, the method comprising**: |
| **discharging at least one cell element of a battery module to produce a quantity of power and a quantity of heat,** | **discharging at least one cell element of a battery module to produce a quantity of power and a quantity of heat,** |
| **absorbing at least a portion of the quantity of heat in a phase change material in thermal contact with the discharging cell element,** | **absorbing at least a portion of the quantity of heat in a phase change material in thermal contact with the discharging cell element**<br>**with the phase change material disposed in a plurality of openings in a heat-conductive containment lattice member,** |
| **following discharge, releasing at least a portion of the absorbed quantity of heat from the phase change material to heat the at least one cell element, and** | **following discharge, releasing at least a portion of the absorbed quantity of heat from the phase change material to heat the at least one cell element to a greater than ambient temperature, and** |
| **discharging the at least one cell element at elevated temperature.** | **subsequently discharging the heated at least one cell element.** |

**Answer:**

Admitted that claim 1 of the '689 patent is compared to claim 21 of the '944 patent, with similar claim elements emphasized, in the table Counterclaim-Plaintiff Workhorse sets forth in numbered paragraph 145 **[141]** above. AllCell objects to Counterclaim-Plaintiff Workhorse's undefined, subjective characterization of "significant overlap" between the claims terms of the '689 and '944 patents, and, therefore, denies the same.

146. **[142]** Despite the new matter in the '474 patent, there is significant overlap between the claim terms of the '689 patent and the '474 patent. For example, claim 1 of the '689 patent recites multiple steps for removing heat from a cell element with a phase change material and

releasing that heat back from the phase change material to the cell element: "discharging at least one cell element of a battery module to produce a quantity of power and a quantity of heat"; "absorbing at least a portion of the quantity of heat in a phase change material in thermal contact with the discharging cell element"; and "releasing at least a portion of the absorbed quantity of heat from the phase change material to heat the at least one cell element." Claim 17 of the '474 recites a similar process, but in a single step, of dissipating heat from a first cell element to a second cell element via a phase change material: "dissipating heat produced by at least a first electrochemical cell element of the electrochemical cell array at least in part via . . . a supply of phase change material . . . , the heat being dissipated to . . . the second electrochemical cell element."

**Answer:**

AllCell objects to Counterclaim-Plaintiff Workhorse's undefined, subjective characterization of "significant overlap" between the claims terms of the '689 and '474 patents, and, therefore, denies the same. AllCell further objects to Counterclaim-Plaintiff Workhorse's subjective characterizations of what "claim 1 of the '689 patent recites" and what "[c]laim 17 of the '474 [patent] recites." Admitted only that the verbatim quotations from such claims that appear in numbered paragraph 146 **[142]** above are accurate.

147. **[143]** Counterclaim-Plaintiff Workhorse seeks a declaratory judgment that the '689 patent is unenforceable.

**Answer:**

Admitted that Counterclaim-Plaintiff Workhorse seeks the declaratory relief set forth in numbered paragraph 147 **[143]** above. Denied that Counterclaim-Plaintiff Workhorse is entitled to such relief.

## PRAYER FOR RELIEF

Plaintiffs/Counterclaim-Defendants deny that Workhorse is entitled to any relief. Plaintiffs/Counterclaim-Defendants further deny each and every allegation in Workhorse's Counterclaims to which they have not specifically responded.

**JURY DEMAND**

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs/Counterclaim-Defendants respectfully demand a jury trial of all issues triable to a jury in this action.

Respectfully submitted,

Dated: November 18, 2019

*/s/ Matthew G. McAndrews*
Matthew G. McAndrews
Kyle D. Wallenberg
NIRO McANDREWS, LLP
200 West Madison Street, Suite 2040
Chicago, IL 60606
(312) 755-8575
Fax: (312) 674-7481
mmcandrews@niro-mcandrews.com
kwallenberg@niro-mcandrews.com

*Attorneys for Plaintiffs,*
All Cell Technologies, LLC and
Illinois Institute of Technology

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 18, 2019, I electronically filed the preceding

**PLAINTIFFS/COUNTERCLAIM-DEFENDANTS' ANSWER TO DEFENDANTS/COUNTERCLAIM-PLAINTIFFS' COUNTERCLAIMS**

with the Clerk of Court using the CM/ECF system which will send notification of such filings to all counsel of record.

*/s/ Matthew G. McAndrews*
Matthew G. McAndrews